**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Moses PINO, Defendant-Appellant.**

**No. 77–1595.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Nov. 17, 1978.

Decided Aug. 30, 1979.

910

Robert Bruce Collins, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., Albuquerque, N. M., on the brief), for plaintiff-appellee.

L. Lamar Parrish, Albuquerque, N. M. (Calvin Hyer, Jr., of Ussery, Burciaga & Parrish, Albuquerque, N. M., on the brief), for defendant-appellant.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant Moses Pino, an Indian of the Zia Pueblo in New Mexico, was convicted on a jury verdict of a charge of violation of 18 U.S.C. Secs. 1153 and 1112. The indictment charged that defendant, an Indian, in Indian country "did, while driving a motor vehicle in an unlawful manner without due caution and circumspection, unlawfully kill Leslie W. Malcomb."

Defendant appeals his conviction and sentence,[1] claiming error in the trial court's refusing to give a lesser-included-offense instruction and in rejecting certain psychiatric testimony offered by him. The issues require a rather detailed statement of the trial testimony.

I

### a. The prosecution case

The Government's version of events surrounding the tragedy unfolded primarily in the testimony of one Nancy Kasaquito, her husband Leandro, and her aunt Rosita Yepa. During the early evening of February 4, 1977, Mrs. Kasaquito was driving from work in Albuquerque to her home at the Jemez Pueblo, north of the Zia reservation off of Route 44. While proceeding in the westbound lane of Route 44 after passing through the town of Bernalillo, Mrs. Kasaquito noticed the lights of a car coming up behind her, "speeding up real fast as it came closer" so that she worried at first about being hit by it. (II R. 83). As the car approached, however, it went off onto the paved shoulder—crossing a solid white line—and passed the Kasaquito vehicle on the righthand side. The passing car was a white station wagon, and was estimated to be going 70–75 miles per hour. There was no oncoming traffic in the eastbound lane of Route 44 when this occurred.

Mrs. Kasaquito observed the station wagon continuing on the shoulder for as far as she could see, despite signs along the roadway reading "Do not drive on shoulder." She saw the white vehicle on the shoulder for about half a mile, then temporarily lost sight of it as it went down a slight slope. She briefly saw it again, still on the "far right side" of the paved strip, when suddenly there were "these real bright lights" which signalled, as it turned out, the collision resulting in Leslie Malcolm's death. (Id. 89–90). These details as to speed of the white station wagon, and the fact that it was never observed to return to the roadway proper from the shoulder after passing, were confirmed at trial by Leandro Kasaquito and Rosita Yepa, both passengers in the car driven by Nancy Kasaquito. (Id. 147; III R. 200–01).

When they came upon the accident scene—and they were assertedly the first people there—the Kasaquitos and Mrs.

---

1. Defendant was sentenced to three years' imprisonment, with the direction that he be confined for six months and that the balance of such sentence be suspended. He was also placed on probation for the three years following his initial confinement.

Yepa found defendant Pino sitting at the wheel of the station wagon. Its front wheels were on the paved shoulder while the rear end was in the dirt or gravel off the roadway. At first the witnesses thought that this had been a one-car accident, but then they saw the front parking lights of another car some distance ahead off the roadway. There were no rear lights illuminated on this car—the Malcolm vehicle—but its rear end had been smashed in considerably by the impact. Nancy Kasaquito testified that she observed defendant at the scene for a couple of minutes and was of the opinion that he was drunk at that time because of the smell of alcohol on him, his stuttering speech and staggering gait, and the way he had earlier speeded past her on the wrong side. (*Id.* 100–02, 145). Rosita Yepa also testified that defendant had smelled strongly of alcohol and had staggered when outside his car; in her opinion, defendant was drunk. (III R. 207–08).

Mr. Malcolm's body was discovered on the ground near the defendant's vehicle. Phyllis Malcolm, the wife of the victim, testified that she and her husband and granddaughter had been driving to Regina from Albuquerque on Route 44. They were about fifteen miles west of Bernalillo when Mr. Malcolm pulled off onto the paved shoulder to investigate the smell of burning rubber under the hood. After initial difficulty in reaching the fan belt, Mr. Malcolm had moved the car further away from the driving surface and then continued tinkering under the hood. Both the wife and granddaughter testified that the car's parking lights were on, illuminating Mr. Malcolm at the front. (III R. 212, 217). The impact occurred from the rear. The Malcolm car was knocked some distance forward, killing Mr. Malcolm.[2] Granddaughter Wanda Malcolm testified that after the accident she did not want to sit in the station wagon which had hit her car, as someone had suggested, "because I smelled booze." Defendant was not then in the station wagon, but

Wanda Malcolm said there was a strong odor coming from inside the car and she saw several bottles of beer in the back seat and on the floor. (*Id.* 220–22).

The Government called as witnesses Officer Darby of the New Mexico State Police and Officer Sosa of the Federal Indian Police, Bureau of Indian Affairs, each of whom had arrived at the scene about a half hour after the 6:30 p. m. accident. Darby identified defendant as the driver of the station wagon involved in the accident and explained his accident reconstruction in which everything was revealed to have occurred on the paved shoulder of Route 44. The Malcolm car, for example, had apparently been completely within the solid white line marking the shoulder and the area of impact was estimated to be 10'3" from that line (*i. e.*, away from the center of the road). (*Id.* 235–40). Photographic exhibits showing a concentration of damage to the right-rear of the Malcolm vehicle were, in Darby's opinion, consistent with his conclusion of direct rear-end impact from the Pino vehicle. (*Id.* 259–60).

Darby testified that although defendant was cooperative at the scene and could be understood, "[h]e appeared to be under the influence of alcohol and had a strong odor on his breath and about his person. He seemed unsure of himself on staying on his feet" and his eyes were "red and watery." (*Id.* 228–29). The officer had listed as "apparent contributing factors," on his accident report, "[d]river's inattention," "under the influence of alcohol," and "[o]ther improper driving" on defendant's part. (*Id.* 264).

Officer Sosa similarly testified that, in his opinion, defendant was drunk at the time of the accident: his eyes were glassy, his speech was a little slurred, and there was an odor of alcohol on his breath. (*Id.* 268–69). Sosa's own reconstruction indicated that the accident had occurred completely within the paved shoulder area. Following the accident defendant was taken to a hos-

---

2. The exact cause of death was a "fractured dislocation of the first and second cervical vertebra with a partial transection of the brain stem" (III R. 311), apparently resulting from the force of the car hood striking the victim's neck.

pital for treatment of a bad lip cut. He there submitted to a blood alcohol test around 9:15 or 9:30 p. m. and was arrested upon release for reckless driving and driving under the influence of alcohol.

The Government's final witnesses sought to demonstrate defendant's alcohol-impaired state at the time of the accident by scientific method and not just by lay opinion. Richard Collins, a chemist employed by the State of New Mexico and an expert on blood alcohol technology, had determined the blood alcohol content in the blood sample taken from defendant on the night of the accident to be .13, using the gas chromatographic method of analysis.[3] This figure is the percentage of grams of alcohol per 100 cubic centimeters of blood at the time the blood was removed—here, around 9:15 or 9:30 p. m. (*Id.* 350–51, 324).

Dr. Allen Jones, associate medical investigator of the State of New Mexico and a specialist in forensic pathology, stated his opinion as to defendant's blood alcohol content at the time of the accident (around 6:30 p. m. on February 4) in light of the test results on blood taken some three hours later. Dr. Jones testified that since alcohol in the blood normally dissipates at the rate of .02 grams per 100 cubic centimeters of blood per hour, defendant's blood alcohol at the earlier time could be estimated to have been .06 higher than it was at the time of removal, or .19. (IV R. 363).[4] Dr. Jones went on to say that, at a .19 blood alcohol level, a person weighing 185 pounds and 5'6" in height would suffer "marked disturbances in perception." (*Id.* 365). He would be dizzy, have slurred speech and stagger-

ing gait, and his coordination would "definitely be impaired"; in sum, "an individual would have a very difficult time safely and adequately driving an automobile at this level." (*Id.* 366–67).[5]

### b. The defense case

Defendant's case rested primarily on his own account of events leading up to the accident and the testimony of several persons who had arrived on the scene shortly after the accident.

Defendant testified that on the afternoon of the accident he had been in Albuquerque in his capacity as Governor of the Zia Pueblo,[6] looking at the Albuquerque Indian School for a Zia boy who was having disciplinary problems there. Defendant had earlier been in Bernalillo to pick up some checks at the Manpower office and had consumed no alcohol as of 3:30 p. m. When he finally left Albuquerque around 4:45 to return to the Pueblo, he again passed through Bernalillo and, seeing a truck belonging to Leo Salas parked outside the Highway Bar in that town, stopped to talk with Salas about some tribal business. Defendant said that he drank only three vodka-SevenUps while at the bar, that this was all the alcohol he had had all day, and that he did not feel drunk when he left the bar. (*Id.* 533, 538–39). Leo Salas had earlier testified that defendant had stopped at the Highway Bar to discuss tribal business with him, had consumed only the three vodka-Sevens while at the bar, and showed no signs of drunkenness either on arrival or departure from the bar.

---

3. The actual reading on the sample was .137, which translates into .133 when allowing for the margin of error, but the third decimal figure is not generally reported in test results.

4. The earlier blood alcohol content would have been even higher—.197—if the exact original reading of .137 were used in this calculation. In either event, the calculation and figures reached assume, as the evidence showed, that no additional alcohol was consumed by the subject in the time between the accident and the taking of the blood sample.

5. Dr. Jones indicated that he would expect "weaving" in the driving of an automobile by

an individual intoxicated to defendant's supposed level at the time of the accident. (IV R. 383–84). Notably on this point, however, Nancy Kasaquito had testified that defendant's station wagon was *not* weaving when it passed her car and continued down the road. (II R. 115–16).

6. Defendant had been Governor of the Pueblo since his appointment to that position in December 1976. Prior to that time he had held various other positions of honor and responsibility to the tribe.

Defendant further testified that after he left the bar he was rushing home in his station wagon along Route 44, going about 60 m.p.h., in order to be on time for a tribal court session at the Pueblo. Some distance out of Bernalillo he heard a strange noise under the transmission or drive shaft as if "something was dragging and I thought it might be a wire or something under the transmission." He therefore "slowed down and pulled off the side of the road trying to listen, but it stopped and I took off again." (*Id.* 535, 536). As he drove further on, along the westbound travel lane,

> I started hearing it again when I started speeding up again and I started leaning over again, so I was going to pull off to the side again and I was leaning over on my right shoulder and it just happened that the [Malcolm] car was parked there and I slammed [. . .] there [was] no chance.

(*Id.* 536). Defendant testified that he did not see the Malcolm car or any lights before the impact and that he had no time to brake his car or turn the wheel before collision. Again, defendant said that he did not feel drunk before the accident, but that he was "in shock" afterwards. (*Id.* 539).

Several witnesses, residents of Zia Pueblo, contradicted the Kasaquitos, Mrs. Yepa, and the police concerning the details of the accident scene. Herman Medina stated that he had arrived on the scene, driving home from Bernalillo, *before* the Kasaquitos got there, that the Malcolm vehicle did *not* have any lights on when he arrived, and that defendant did not appear to be drunk at that time. Melvin Shije testified that he had been in a pickup truck with two other Indians, just leaving the Zia Peublo and going toward Bernalillo on Route 44, when he saw one set of headlights coming from the opposite direction about a half mile away. He saw no other headlights or parking lights, and the one car that was visible appeared to be pulling over to its right until its lights went out. Shije thought at the time that the car was parking on the shoulder, but he soon learned that it (Defendant's station wagon) had collided with another vehicle.

Lucy Galvan and her sister Ruth Sais, who had been driving from Albuquerque to Zia, both gave their opinion at trial that defendant was not in a drunken state at the accident scene. Finally, Earl Gachupin testified that some time before the accident took place he had passed the Malcolm car parked on the shoulder of Route 44 without any lights on and had had to swerve to go around it. Gachupin later returned to the scene of the accident and at that time defendant did not appear drunk, did not stagger, and had no difficulty understanding both English and Indian.

Defendant also presented testimony by his own accident reconstruction expert. Joseph Holland stated that although he agreed with prosecution witnesses that the collision had occurred completely on the paved shoulder, the evidence indicated to him that defendant's car was moving at an angle of 10–15 degrees to its right at impact—that is, at an angle "[w]hich would be consistent with a change . . . if one were pulling off the roadway." (IV R. 425). He estimated that the station wagon was going 50–60 m.p.h. at the time of the accident, with no evidence of braking prior to impact. Holland further concluded that the Malcolm automobile's rear lights had *not* been on at the time of collision: inspection of the lamp wiring on the wrecked car revealed no white oxidation residue which would have been present if the lights had been illuminated. (*Id.* 426–27).

Dr. Vernon Jones, an expert on the effects of alcohol on the body, estimated that the blood alcohol content of the drinker of three bar drinks would be between .07 and .12 at its peak, depending on the exact strength of those drinks. Allowing for "lag time" in the absorption of alcohol into the bloodstream—a period which evidently had not ended in defendant's case as of the time of the accident—Dr. Jones stated that the blood alcohol would have been less than .10 (*i. e.*, below the limit of legal intoxication) at the relevant time. (*Id.* 469–70, 473). Dr. Jones discussed the inhibitory effect that the physiological state of shock can have on

alcohol absorption, due to greatly decreased blood circulation to the stomach and other organs—a possible explanation for defendant's abnormally high blood alcohol reading some 3½ hours after he had taken his last drink, assuming only three drinks had been consumed.

The defense further sought to introduce testimony of Dr. John McCarthy concerning defendant's personality and behavior type as relevant to the question whether defendant would be likely to act in a reckless manner, endangering the lives of others, while under the influence of alcohol. As discussed below, the trial court excluded such testimony completely, although Dr. McCarthy was allowed to testify as to the similarity of the symptoms of drunkenness and shock. The witness stated his belief, based on the description and photographs of the accident but not on personal examination of defendant near that time, that defendant was in shock following the collision. (*Id.* 500–01).

We turn to the defendant's appellate contentions.

## II

### *The lesser included offense issue*

Defendant argues that he was entitled to an instruction on careless driving, based on Sec. 64–22–3.1 N.M.S.A. (1953),[7] as a lesser included offense to the involuntary manslaughter by automobile charged in the indictment. Defendant submitted such an instruction to the trial court and properly objected to the failure to give such an instruction at the end of trial. (V R. 611–12). He claims error, relying mainly on *Keeble v. United States*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844, and *Joe v. United States*, 510 F.2d 1038 (10th Cir.).

At the outset we note that Rule 31(c), F.R.Crim.P., provides that in any case the defendant ". . . may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." Although the language is in discretionary terms, it is ". . . mandatory in the sense that if there is evidence to support a lesser included offense and defendant requests such a charge, the court has no discretion to refuse to give the instruction." 8A *Moore's Federal Practice*, par. 31.03. Indeed the *Keeble* case refers to "difficult constitutional questions" which would have arisen if the Major Crimes Act had been construed to preclude such an instruction, while recognizing that the Court had never explicitly held that a lesser-included-offense instruction is a component of due process. *Keeble, supra*, 412 U.S. at 213, 93 S.Ct. 1993. The Court referred to Rule 31(c) and to its numerous decisions recognizing the defendant's right to such a charge. *Id.* at 208, 93 S.Ct. 1993.

The *Keeble* case is our principal guide in considering this appeal. There an Indian defendant was charged under the Major Crimes Act with assault with intent to commit serious bodily injury resulting in the death of another Indian on the reservation of the Crow Creek Sioux Tribe. The trial court refused to give a lesser-included-offense instruction on simple assault, and the Eighth Circuit affirmed the ruling.

The Supreme Court reversed. The Court rejected the Government's argument that the Major Crimes Act precluded the lesser-included-offense instructions because the statute was a carefully limited intrusion into the exclusive jurisdiction of the Indian tribes to punish for crimes committed on Indian land. The Court reasoned that the purpose of the Act was to extend federal jurisdiction to close a gap where prosecution of serious crimes by federal authority had been lacking, that the congressional

---

7. At the time in question, Sec. 64–22–3.1 N.M. S.A. (1953) was entitled "Careless driving," and provided

    A. Any person operating a vehicle on the highway shall give his full time and entire attention to the operation of the vehicle.

    B. Any person who operates a vehicle in a careless, inattentive or imprudent manner, without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances is guilty of a misdemeanor.

intent however was not such as to deprive Indian defendants of procedural rights granted to other defendants, and that the provisions of the Act—notably its provision for trial of Indians "in the same manner" as other persons—prevented a conclusion that Congress intended to deprive Indians of a lesser offense charge when it was available to a non-Indian charged with the same offense.

The defendant here claims that *Keeble* clearly compels a conclusion that he was likewise entitled to a lesser offense charge. In response, the Government makes several points which we will consider.

*First*, the Government points out that in *Keeble* the offense of simple assault as a lesser offense was a federal crime under 18 U.S.C. Sec. 113(e) if committed within the special maritime and territorial jurisdiction of the United States, and that a like situation existed in *Joe v. United States*, 510 F.2d 1038 (10th Cir.). The argument is that there is no federal crime prohibiting "careless driving" so that there "is no jurisdiction in the court to instruct or convict on such a charge." (Brief of Appellee, 13).

■ Without deciding whether there must be an independent federal jurisdictional basis for giving a lesser-included-offense instruction, we must reject the Government's argument on the point. The Assimilative Crimes Act, 18 U.S.C. Sec. 13,[8] assimilates state traffic laws and others into federal enclave law in order "to fill in the gaps in the Federal Criminal Code, where no action of Congress has been taken to define the missing offense." *United States v. Sosseur*, 181 F.2d 873, 875 (7th Cir.); *see United States v. Pardee*, 368 F.2d 368 (4th Cir.). The Act reaches activities on Indian reservations since such areas are "re-

served or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." 18 U.S.C. Sec. 7(3). *See Williams v. United States*, 327 U.S. 711, 713, 66 S.Ct. 778, 90 L.Ed. 962; *Acunia v. United States*, 404 F.2d 140, 142 (9th Cir.); *United States v. Sosseur, supra*, 181 F.2d at 874.

Thus, a non-Indian being tried for manslaughter on the Zia reservation could receive from the federal judge a lesser-included-offense instruction based on a New Mexico statute—such as that covering careless driving—not displaced by a federal statute,[9] assuming the validity of the State enactment as a lesser included offense in other respects. The Indian defendant would, under the principles of *Keeble*, be entitled to no less.

■ *Second*, the Government contends that even assuming the court's power to charge on careless driving, the lesser offense does not qualify here because "the lesser offense must be such that it is impossible to commit the greater without having first committed the lesser." *Larson v. United States*, 296 F.2d 80, 81 (10th Cir.); *see also United States v. Twiford*, 600 F.2d 1339 (10th Cir.); *Williams v. Turner*, 421 F.2d 168 (10th Cir.); Rule 31(c), F.R.Crim.P. (Brief of Appellee, 13). The general rule stated in *Larson* and appearing also in Rule 31(c) could arguably be applied here by examining the statutory elements alone to reject the lesser offense argument. Involuntary manslaughter, it is said, can be committed in a number of ways other than by operating a vehicle and hence, from the statutory provisions alone, arguably the greater offense could be committed without committing an act connected with the lesser.

---

**8.** 18 U.S.C. Sec. 13 provides that

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws

> thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

**9.** The Government has cited no federal enactment covering the Zia reservation which would supersede the State careless driving law, making it unavailable for use in federal court under the Assimilative Crimes Act.

We are not convinced that so strict an application of the rule is proper. It is true that common law cases earlier dictated a strict adherence to the statutory elements alone and analysis of them as the basis for determining the availability of a lesser offense charge. *See Crosby v. United States*, 119 U.S.App.D.C. 244, 245, 339 F.2d 743, 744 (D.C.Cir.). We are persuaded, however, not to apply the artificial analysis suggested by the Government and that instead the availability of the lesser-included-offense instruction should be decided in practical terms of the evidence developed in *this* case on the offense charged. *United States v. Whitaker*, 144 U.S.App.D.C. 344, 349–350, 447 F.2d 314, 319–20 (D.C.Cir.).

The *Whitaker* opinion presents a most persuasive analysis. There it was held that a lesser offense instruction on unlawful entry should have been given in a trial for first degree burglary. The Government blocked the giving of the charge by arguing that the offense of unlawful entry required the element of entry without authority and against the occupant's will, while in certain circumstances burglary there could be committed even though entry was authorized (*e. g.*, entering a place of business open to the public or a friend's apartment with intent to steal). Thus the lesser offense technically was not "necessarily included" with the greater and the instruction was refused. The Court of Appeals held that the instruction should have been given, stating (447 F.2d at 319–320):

▮ A more natural, realistic and sound interpretation of the scope of 'lesser included offense,' in line with our own views on the subject, is that defendant is entitled to invoke Rule 31(c) when a lesser offense is established by the evidence adduced at trial in proof of the greater offense, with the caveat that there must also be an 'inherent' relationship between the greater and lesser offenses, *i. e.*, they must relate to the protection of the same

interests, and must be so related that in the general nature of these crimes, though not necessarily invariably, *proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense.*

\* \* \* \* \* \*

▮ . . . Considering the proof adduced at trial in support of the charged offense, Whitaker was shown to have battered down the door of a dwelling house in order to gain entry. His entry was by force and was therefore unauthorized and unlawful. All of the elements of unlawful entry were clearly established. To prove burglary, the prosecution had only to establish the additional element of entry with the intent to commit a crime therein.

We think it is unrealistic and artificial, on the statute involved, the indictment, and the proof in this case to deny a lesser included offense instruction on unlawful entry. (Emphasis added).

*See also United States v. Stolarz*, 550 F.2d 488 (9th Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 162, 54 L.Ed.2d 119; *but see Virgin Islands v. Smith*, 558 F.2d 691, 696 (3d Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 316. We feel the reasoning of the *Whitaker* and *Stolarz* cases most persuasive and that they are in harmony with the general rule stated in *Sansone v. United States*, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 13 L.Ed.2d 882.

Applying those principles, we are convinced that the "necessarily included" requirement was met here. The evidence on defendant's operation of the vehicle, the collision, and the victim's death established all the elements of the lesser offense of careless operation of a vehicle within the terms of Sec. 64–22–3.1 N.M.S.A. (1953). (See note 6, *supra*.) To prove the greater offense of involuntary manslaughter "while driving a motor vehicle in an unlawful manner without due caution and circumspection," as charged in the indictment,[10] the

---

10. As noted, the indictment charged unlawful killing of the victim Malcomb in violation of 18 U.S.C. Secs. 1153 and 1112. Section 1112(a) defines involuntary manslaughter as the unlawful killing of a human being without malice

[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

prosecution had only to prove further that defendant's "conduct in this regard was reckless, wanton and willful and with utter disregard for the safety of others . . ." and that defendant "should have foreseen that his conduct would constitute a threat to the lives of others," as the trial court charged. (V R. 604).

The practical test outlined in the *Whitaker* case was met in the context of the evidence which fleshed out the indictment, and the charge itself. In the practical terms of our case there was a further disputed factual element—recklessness and foreseeability of harm—which was not required in proving the lesser included offense. Thus the offense of careless operation of a vehicle was a "necessarily included" offense in the involuntary manslaughter case as charged and tried here.

*Third,* the Government argues that even if careless driving might be treated as a lesser offense here, such an instruction was not warranted because the jury could not rationally find that the defendant's operation of the vehicle was merely negligent, rather than "unlawful, reckless and wanton." (Brief of Appellee, 16–21).

It is true, of course, that a lesser offense instruction will only be given if there is evidence to support a finding that the lesser offense was committed while the greater was not. *Keeble, supra,* 412 U.S. at 208, 214, 93 S.Ct. 1993; *United States v. Coppola,* 526 F.2d 764, 774 (10th Cir.). Nevertheless, while we of course express no view on the merits of the defense, we cannot agree that the evidence was such that the jury could not rationally find that defendant was guilty of careless driving, as opposed to reckless and wanton driving resulting in the victim's death. The defense evidence has been detailed above, see Part I b, *supra.* We note again that there were several defense witnesses at the scene who disputed the claim of defendant's drunkenness, as defendant did; one expert and one lay witness supported his position that the

Malcomb vehicle's rear lights were not on; the lay witness, a tribal safety officer, said he had to "sort of curve—swerve to my left" when he passed the Malcomb car (IV R. 451, 453–54); and another expert witness supported defendant's position in that defendant's car was moving "consistent with a change in angle if one were pulling off the roadway . . ." (IV R. 425).

The defendant in a criminal case is entitled to adequate instructions on his theory of defense, provided there is evidence before the jury to reasonably support such a theory. *Beck v. United States,* 305 F.2d 595, 599 (10th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123. Considering the evidence favoring the defendant, as we must, and the jury's prerogative to believe the defense witnesses, "[w]e cannot say that the availability of an option to convict of a lesser offense would not have resulted in a different verdict." *Joe v. United States,* 510 F.2d 1038, 1040 (10th Cir.).

In sum, we are convinced that the refusal of the lesser offense instruction was a prejudicial error in the circumstances of this case.

### III

Lastly, defendant claims error in the rejection of expert testimony. We will discuss the claim briefly because of the possibility of a reoccurrence of the problem in a new trial.

Defendant complains of the rejection of expert testimony from Dr. John McCarthy, a specialist in psychiatry, forensic medicine and neurology. The witness was permitted to testify that in his opinion defendant was in a state of shock after the impact and that the conduct of one in shock—hence with lessened blood pressure and feeling faint or dizzy and staggering—is similar to that of one in a state of drunkenness. (IV R. 499–500). However, the major portion of the testimony by the doctor which de-

fendant sought to introduce was rejected, and defendant claims that there was prejudicial error and an abuse of discretion in this ruling.

Counsel's offer of proof was in substance that the witness would testify as to the "type of personality and behavior which the Governor possesses . . ." (IV R. 519); as to whether driving in a reckless and wanton way was consistent with defendant's personality (IV R. 497); that given amounts of alcohol "affect given personalities in different ways . . ." (id. at 519); that with the amount of alcohol in evidence—three drinks—defendant's reaction would not be to act in a reckless, incautious way; and that he would not have insufficient caution to care for fellow human beings and would "not become incautious but indeed might become more cautious . . ." (Id. at 520).

In addition, counsel said the doctor would testify that the ability of defendant to attach his rather complicated seat belt and perform other similar motor functions would indicate defendant was not drunk, as the Government claimed. Counsel said the doctor would not testify as to sanity or insanity, which was not claimed. (Id. at 520).

The trial court remarked that the testimony almost reached the point of whether defendant was competent to stand trial, that the testimony was going into the question whether defendant could form an intent, that the only question in this respect was whether he was too drunk to form an intent, and that the court had a specific instruction on that point. As noted, the court admitted testimony on the similarity of actions of one in shock to those of an

intoxicated person, but excluded the remainder. (Id. at 497–500).

The problem was difficult for the trial court because portions of the offers of proof were unusual and vague. We cannot agree with the defendant that the admission of psychiatric testimony must go to all the lengths attempted here. The expert is not free to say that because of the defendant's personality, he would not have driven in a reckless or wanton manner, thus substituting his judgment as to the defendant's state of mind. See United States v. Bennett, 539 F.2d 45, 52 (10th Cir.), cert. denied, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293; United States v. Brown, 540 F.2d 1048, 1054 (10th Cir.), cert. denied, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549; United States v. Milne, 487 F.2d 1232, 1235 (5th Cir.), cert. denied, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823.[11] The trial court must be satisfied that the proof offered is grounded in sufficient scientific support to warrant its use in the courtroom and the court must decide whether it would aid the jury in deciding the ultimate issues. See United States v. Bennett, supra, 539 F.2d at 53. And, of course, the competency of an expert to express an opinion lies largely within the trial court's discretion. United States v. Kienlen, 415 F.2d 557, 558 (10th Cir.).

We cannot, however, agree with the trial court's reasoning that the whole line of testimony almost went to competency to stand trial or to form an intent, that an instruction was being given on whether drunkenness prevented the forming of intent, and that the proof was therefore inadmissible. The instruction merely recognized the presence of such an issue on the required intent; the admissibility of any

---

11. We are mindful of the fact that Rule 704, F.R.E., provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." We do not feel, however, that the rule means that the witness may simply say that the defendant would not, or did not, drive recklessly.

The Advisory Committee's note on Rule 704, see 3 Weinstein's Evidence 704–2, says that the

abolition of the ultimate issue rule does not lower the bars to admit all opinions, referring to Rules 701, 702 and 403. The Committee states that "[t]hese provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." (Emphasis added); see Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 511 n. 17 (2d Cir.), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134.

competent proof going to the issue is another matter. Defendant's counsel disavowed any claim of insanity but argues that the expert testimony was competent on the effect of alcohol, taking into account defendant's personality.

We note that there are instances when, with a proper scientific basis, qualified expert testimony is admissible as to the effect of a given amount of alcohol on a defendant's mental capacity, *e. g., United States v. Smith,* 552 F.2d 257, 260 (8th Cir.), including its effect on a particular individual's ability to operate a vehicle. *See Mittlieder v. Chicago and Northwestern Ry. Co.,* 413 F.2d 77, 81 and n. 1, 84 (8th Cir.). On retrial, and with more specific testimony offered, the trial court can determine if the expert testimony properly qualifies for admission, admitting all evidence which appears to be relevant, *Pope v. United States,* 372 F.2d 710, 736 (8th Cir.), *cert. denied,* 401 U.S. 949, 91 S.Ct. 953, 28 L.Ed.2d 232.[12]

We should mention briefly some further portions of the expert's testimony. As noted, the trial judge admitted testimony by Dr. McCarthy that in his opinion the defendant was in a state of shock after the impact and that the appearance of one in such a condition is similar to that of a drunk person. We feel that such testimony was properly admitted. In the same vein we also believe that his testimony should have been admitted when he said that performance by defendant of certain motor functions disproved the state of drunkenness alleged. The doctor's expertise included neurology as well as his other qualifications, which were accepted. The evidence was relevant since the testimony tended to make the existence of the defendant's alleged drunkenness "more probable or less probable than it would be without the evidence." Rule 401, F.R.E.

Accordingly, the judgment is reversed and the case is remanded for a new trial in accord with this opinion.

12. The Government argues that the delay of some four months before the doctor's examination of defendant renders the testimony inadmissible. Such factors generally go to the weight of the testimony, see *United States v.*

*Taylor,* 562 F.2d 572, 575 (8th Cir.), *cert. denied,* 434 U.S. 988, 98 S.Ct. 620, 54 L.Ed.2d 484, but they may be considered by the trial court in determining the sufficiency of the scientific basis for the testimony.