In re Jamie Lynn IRVIN, Debtor.

Betty Ann LOVATO, Plaintiff,

v.

Jamie Lynn IRVIN, Defendant.

Bankruptcy No. 82 B 01368 J.
Adv. No. 82 M 0933.

United States Bankruptcy Court,
D. Colorado.

June 6, 1983.

Fasing & Fasing by Gregory Fasing, Lakewood, Colo., for plaintiff.

Susan M. Lach, P.C. by Sherrie D. Vincent, Fort Collins, Colo., for defendant.

## MEMORANDUM OPINION

JAY L. GUECK, Bankruptcy Judge.

Debtor-defendant, Jamie Lynn Irvin, filed a voluntary petition under Chapter 7 of the Bankruptcy Code on April 1, 1982. That petition listed a stipulated Judgment obtained by Betty Ann Lovato, the plaintiff herein, in the amount of $5,200.00. Plaintiff has filed a complaint alleging this obligation to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) on the grounds that the actions of the debtor which gave rise to the Judgment were willful and malicious. The debtor admits the Judgment but denies that the actions were willful and malicious so as to bar her discharge.

## FINDINGS OF FACT

Plaintiff (hereinafter referred to as Lovato) and debtor-defendant (hereinafter referred to as Irvin) first met in 1977. They began living together in late 1977 for a period of several months. The relationship was a tempestuous one from the beginning, primarily centered around Irvin's jealousy over prior relationships of Lovato. There were at least three occasions into 1978 when Irvin threatened Lovato at knife point. Irvin testified that on those occasions that she was "irrational" and "out of control." This resulted in a brief termination of the relationship, but in the fall of 1978, the parties reconciled and traveled together in October to Pennsylvania. Shortly after their return to Colorado, Irvin became upset at the prospect of Lovato packing to move away again and kept Lovato at the premises at knife point. However, Lovato left while Irvin was taking a shower.

Later, in approximately January or February, 1979, Irvin broke into the home where Lovato was then living and hid under Lovato's bed with a tomahawk, a knife and other paraphernalia, waiting for Lovato to retire. After Lovato was asleep, Irvin attacked her with the knife and tomahawk actually cutting Lovato's hand. Nonetheless, Lovato moved back into residence with Irvin in March, 1979.

During the course of this relationship there were numerous other incidents of violence, threats of suicide as well as threats by Irvin to kill Lovato and actual overt acts and emotional outbursts on the part of Irvin. During this same period, Irvin admitted to Lovato that she had similarly attacked women from prior relationships, even to the extent of traveling to Germany where she attacked a former friend nearly severing that individual's arm. In short, the evidence indicates a long history of episodic violence leading to the incident in question.

The matter which gives rise to the controversy in this action occurred on April 27, 1979. The relationship between Lovato and Irvin had been understandably tense, and they were jointly seeking counselling. On that date, they jointly consulted with Dr. Dorothy LaFleur, a clinical psychologist. Dr. LaFleur had been treating Irvin since January, 1979. Together, Dr. LaFleur and Irvin had explored Irvin's history of violence and depression at the thought of abandonment. It had been discovered that much of the violence had been tied to Irvin's menstrual periods. Dr. LaFleur and Lovato both testified that on the occasion of this joint consultation, April 27, 1979, Irvin's appearance was markedly different. She was quite distressed, appeared "irrational" and seemed quite anxious and depressed. She noted that she had just started menstruating. The parties had engaged in conversation earlier that day wherein Lovato had expressed a desire to join the National Guard, which Irvin interpreted as some indication that Lovato might be leaving the area and "abandoning" Irvin once again.

On April 27, 1979, Dr. LaFleur suggested during the counselling session that the parties should remain separated from one another during the weekend. Irvin became very upset over this. Following the session, Irvin followed Lovato outside and insisted they continue their discussion in private. Lovato declined. Irvin then followed Lovato in her automobile and, after a bizarre auto chase, she forced the Lovato automobile over and then forced her way into the Lovato vehicle. Thereafter, Betty Lovato got out of her automobile and tried to run. Irvin followed her, caught up with her and began stabbing her in the back and across the chest with a steak knife. Lovato then incurred a severe laceration to her hands when she tried to grab the knife to protect herself. Lovato escaped and ran, with Irvin again in pursuit. When Irvin again caught Lovato, Irvin said she would take Lovato to the hospital. They got into the Lovato vehicle with Lovato bleeding profusely, feeling faint, and her clothes soaked with blood. Instead of driving to the hospital, Irvin drove past St. Anthony's Hospital and proceeded toward Louisville, Colorado, then drove past Rocky Flats, through a mountain canyon, to a motel. During this time, Lova-

to continued to plead to go to the hospital, while Irvin occupied herself in discussion about their relationship, past relationships, and her fears that Lovato would reveal to the authorities the attack that had just occurred.

After checking into a motel, Irvin assisted Lovato in washing her wounds in a tub of water and washed some of Lovato's clothes. They remained at the motel while Irvin continued to involve Lovato in further discussions about their relationship. During this time Lovato's hand would not stop bleeding and she testified that they could see "bone and ligaments." Finally, Irvin conceded that they needed to get to a hospital. However, even after they left the motel to take Lovato to the hospital, Irvin continued to wander around, finally driving to a sand pit while she made up a story for Lovato to tell to the hospital Personnel in an effort to avoid implicating Irvin in any assault. It was only after Lovato agreed not to reveal the truth about what had happened that Irvin finally took her to Denver General Hospital. This was approximately 1:30 a.m., over five or six hours after the incident. Upon entering the hospital, Lovato immediately sought protection and revealed what had happened. Irvin was then arrested and subsequently charged with aggravated assault. The criminal matter was resolved by virtue of the entry of a guilty plea to attempted felony assault. It is noted that one of the elements of felony assault is the intent to do bodily harm.

Important to the resolution of the issues herein is the fact that prior to and in preparation for the consulting session with Dr. LaFleur, Irvin took the knife from her kitchen drawer, concealed it in her sock and took it to the counselling session. This is the steak knife which was used during the course of the assault.

In addition to criminal charges, Lovato commenced a civil suit against Irvin in the Denver District Court, seeking compensation for her injuries. This matter was resolved by a stipulated settlement in the amount of $5,200.00. Shortly thereafter, Irvin filed the Petition in Bankruptcy, wherein she seeks a discharge of all of her debts, including the Lovato judgment.

Against the backdrop of the foregoing facts, Lovato seeks to have the civil judgment excepted from discharge under 11 U.S.C. § 523(a)(6) "for willful and malicious injury by the debtor to another. . . ." Irvin contends that her conduct was not willful and malicious, but was the result of uncontrollable conduct on her part, in that she was suffering from "premenstrual syndrome", (also referred to as "PMS").

Irvin testified that she had begun menstruating on April 27, 1979, that she was suffering from cramps and pain, was confused and frightened, that she couldn't think, and that as the events unfolded it was as if "someone else took over" her body. She stated that during the attack it was as if she were "outside of my body watching a dark-complected woman doing the stabbing." Irvin does not resemble this description and contends this conduct was the product of some irrational, uncontrollable behavior. Irvin indicates that within moments she returned to a rational state, but that she was still scared. She explains that she did not immediately proceed to the hospital because from her observations of Lovato's condition, it did not appear Lovato required immediate attention. Irvin bases this upon her medical experience as a veterinary technician. She attributes all of her bizarre conduct during the period surrounding April 27, 1979, to suffering from premenstrual syndrome.

Irvin explains she discovered as early as 1973 while serving in the Army, that some violent behavior appeared to be associated with her menstrual cycles. It is her contention that up to two weeks prior to her menstrual period she would show symptoms of depression and violence, often with an inability to control her conduct. However, she did not realize she suffered any dysfunction, but did explain this problem to therapists and psychiatrists when admitted to the VA hospital in Pittsburgh in approximately 1975. She was given prescriptions for valium, but little else was accomplished

by way of therapy. Irvin testified she continued to seek therapy after leaving military service, and that she explained to various therapists and physicians that there seemed to be a correlation between her violent behavior and her menstrual problems. However, she indicates nothing was done by way of treatment until she sought the assistance of Dr. David Muller in the fall of 1979, after the incident in question. Dr. Muller referred her to Dr. John Farinholt, an OB–GYN. Treatment was initiated through progesterone injections. Finally, after suffering deleterious side effects from this treatment, a hysterectomy was performed in September, 1982. The testimony indicates that Irvin has suffered no further emotional difficulties since that surgery.

The record reflects numerous incidents of violence, apparently not associated with any menstrual cycle at all. One witness, who had been a roommate of Irvins for one and one-half to two years, from 1976 through 1978, testified to several such occurrences. On one occasion, Irvin attacked this woman, breaking her jaw and loosening teeth. On another occasion, while Irvin was employed as a veterinary technician, Irvin attacked and overpowered this same witness, placed a tourniquet on her arm and threatened to inject her with euthanasia drugs. The witness succeeded in talking Irvin out of proceeding with this threat and actually continued to live with Irvin thereafter. Additionally, this same person was slammed against the wall by Irvin when Irvin exhibited a fit of anger after taking an overdose of drugs. On another occasion, Irvin was arrested for resistance. There were numerous incidents with knives, even to the extent of cutting the chest of this roommate after Irvin had forced her onto the bed. Another occurrence was noted when Irvin hid a knife under the seat of the automobile and used it in one of her threatening episodes. There were high speed automobile incidents, wherein Irvin threatened to drive off the road or into a tree, killing herself and the occupant. This particular roommate testified that there were 20 to 25 events of various threats, occurring 3 or 4 times a week. There was no indication that these were in any way correlated with any cycle. Indeed, the testimony of this witness was that there were "no peak times, even with major incidents." Irvin did not refute this testimony.

It is also noted that this roommate indicated Irvin had stated she could control her actions "if she wanted to", and that she only acted-out when members of the public were not present.

Another roommate who had lived with Ms. Irvin for over one and one-half years, from early 1973 through mid-1974, indicated she knew by Irvin's comments as well as her own observations when Irvin was menstruating. This individual was the subject of the knife attack which nearly severed her arm, resulting in the loss of 50% of the use of her right arm. There were other episodes of jealous rages wherein knives were brandished amid accusations of "affairs." This individual indicated that in over one and one-half years, Irvin must have "pulled a knife a 100 times." She also stated that Irvin threatened or attacked her at least once a week over this period of time. On one occasion, Irvin held a shotgun to this roommate's head for approximately two hours in an effort to extract admissions of infidelity or intended abandonment. On another occasion, Irvin allegedly struck this lady in the eye, fracturing her eye orbit. Irvin also broke this witness' collar bone in a separate incident and bruised her ribs when she hit the woman with a fist, knocking her against the wall.

Finally, Irvin intentionally ruined this witness' military career by angrily revealing their homosexual relationship, knowing the Army would dismiss this individual from the military service. Irvin stated on numerous occasions, according to the testimony, that she could avoid responsibility for her actions by "telling the shrinks what they want to hear" and that she could "fake the shrinks out." There was no apparent correlation of these incidents with any menstrual cycle. In fact, on Irvin's second trip to Germany which resulted in disabling this woman's arm, there was a great deal of

evidence of deliberation and planning. During this time, according to the testimony, the former roommate was experiencing her own menstrual period and recalled Irvin stating she had already had hers. This witness also indicated that during this period of one and one-half years, Irvin never stated to her that she felt any connection between psychological problems, violence and her menstrual period, although Irvin had testified she observed this as early as 1973.

■ One may well wonder why these witnesses continued to come back for more and persisted in their relationship with Irvin. However, this is a separate psychological phenomenon which need not be addressed in this opinion. Suffice it to say, the evidence seemed straightforward and overwhelming and generally not contradicted by Ms. Irvin. Indeed, most of the conduct was admitted by Irvin and was even the subject of some of her own testimony. It is also noted that at no time did either party seek to invoke Rule 404, Federal Rules of Evidence, to prevent the introduction of testimony relating to prior conduct. It would appear that this testimony was admissible under Rule 405, F.R.E. in any event.

With respect to expert testimony, Dr. LaFleur indicated that Irvin felt in control of herself shortly before their consultation session ended on April 27, 1979. Dr. LaFleur also acknowledged Irvin could be manipulative, but felt she was no more so than other patients. This psychologist also indicated that Irvin, historically, tended to blame others for her problems. She did note that Irvin seemed much improved after her hysterectomy.

Dr. LaFleur began treatment of Ms. Irvin in early 1979 and had really just begun to explore a possible connection with premenstrual syndrome. "PMS is very new, highly controversial, and there is little literature on the subject," according to Dr. LaFleur. This testimony, together with other expert evidence in this action, reflected a lack of any general acceptance of PMS in the psy-

chiatric community as an explanation for inappropriate behavior.

The only psychiatrist to testify in this matter was Dr. David Muller, who began treating Ms. Irvin in the Fall of 1979, after the assault herein. Dr. Muller saw Irvin on four occasions. Menstrual difficulties were not even discussed in the first three meetings. Dr. Muller learned of the possible connection between Irvin's menstrual cycle and her emotional upsets when Dr. LaFleur expressed this concern in the latter part of 1980.

The symptoms noted by Dr. Muller were that Irvin was very sensitive to loss and rejection in personal relations, and she had difficulty maintaining control of herself and dealing constructively with her anger. He noted that Irvin experienced episodes of extreme rage, despair, depression and at times felt "out of control."

These observations and the history upon which Dr. Muller based his conclusions were gleaned from what Irvin told him in late 1979 and 1980. There was no opportunity for Dr. Muller to review prior medical records or to speak with other persons involved in Irvin's past. Based upon his observations and the history related to him by Irvin, Dr. Muller concluded that Irvin suffered a borderline personality disturbance and, secondarily, a premenstrual syndrome (PMS). The diagnosis relating to premenstrual syndrome was that she suffered to a "moderately severe" extent.

The symptoms which give rise to a diagnosis of PMS, according to Dr. Muller, are "increased irritability, fatigue, anger, depression, often suicidal and problems with sleep." Dr. Muller did not list homicidal tendencies or extreme violence as a symptom of PMS. However, his testimony would indicate that such behavior is consistent with this condition.

The psychiatric profession, according to Dr. Muller, is still in disagreement as to the cause or influence of PMS on human behavior. He regards the syndrome as a mental illness but not a personality disorder or psychosis, but acknowledges controversy in this regard. Further, it is not clear in the

profession whether emotional instability leads to, or results from, PMS. This is somewhat important to a determination of the issues herein.

The Diagnostic and Statistical Manual (DSM) relied upon by many psychiatrists, and regarded by Dr. Muller as "important", does not even list PMS. The latest edition appears to be DSM III, published in 1980. It does not recognize PMS as a mental illness, as a mental disorder, or as a personality disorder. It does not record PMS as a medical problem. The explanation for this was that the diagnosis of PMS and its impact on the human psyche · is not fully known and there is little information on the subject. It is clear from the testimony that PMS and its affect on human behavior is still the subject of medical debate. Its acceptance as an explanation for improper conduct has not yet been established, either medically or legally.

In the final analysis, Dr. Muller was not asked to render an opinion that, to a reasonable degree of medical certainty, Irvin's conduct on April 27, 1979, was proximately caused by her suffering from PMS. He did testify that her borderline personality disorder, coupled with PMS, markedly impaired her ability to think out and form logical decisions. This ability was diminished to about 25% to 30% of her normal ability, according to his testimony. I accept the testimony of Dr. Muller as the best psychiatric guess available in this instance.

The testimony of Dr. Jon Farinholt, Irvin's OB–GYN, was also elicited. Dr. Farinholt examined and treated Irvin for PMS after she was referred to him by Dr. Muller, in December, 1980. The symptoms, as related to Dr. Farinholt by Irvin, were complex and were consistent with PMS. Dr. Farinholt has now treated several patients for this disorder, and stated that the syndrome· "occurs in almost every lady who menstruates." Only the severe cases require medical treatment. Irvin's symptoms were severe enough to require progesterone injections, followed by a hysterectomy. She has markedly improved since the surgery in September, 1982.

Dr. Farinholt candidly acknowledged he had no opportunity to obtain a detailed past history, and was only able to get a recording of Irvin's past two menstrual periods when he began her treatment. He was not asked for a medical opinion of whether or not Irvin's conduct on April 27, 1979, was proximately caused by suffering from PMS.

On this state of the record, and the uncertain state of psychiatric evaluation, I am asked to make a judicial determination that the attack by Jamie Irvin on Betty Lovato on April 27, 1979, was not willful and malicious but was, rather, proximately caused by Irvin's suffering from premenstrual syndrome. If that is the case, Irvin's debt to Lovato is dischargeable. However, if the conduct is not excused by PMS, and if it was willful and malicious, the debt is non-dischargeable under 11 U.S.C. § 523(a)(6).

## CONCLUSIONS OF LAW

The operable section of the Code in this matter is 11 U.S.C. § 523(a)(6). That section provides that a discharge under § 727 (the pertinent provision herein) does not discharge an individual from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The burden of proof is on the plaintiff to establish that the acts in question were willful and malicious. *In Matter of Dardar,* 620 F.2d 39 (5th Cir.1980); *In re DeRosa,* 20 B.R. 307 (Bkrtcy.N.Y.1982). The standard of proof required is clear and convincing evidence on the part of the petitioning creditor. *In re DeRosa, supra.*

"Willful and malicious", as used in § 523(a)(6) of the Code, has been defined in the following manner:

"An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will. The word 'willful' means 'deliberate or intentional'; a deliberate and intentional act which necessarily leads to injury." 3 *Collier on Bankruptcy* (15th Ed.) § 523.16(1).

The foregoing definition is consistent with the Legislative History of § 523(a)(6) which states "'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled." H.R. No. 95–595, 95th Cong., 1st Sess. at 365 (1977), U.S.Code Cong. & Adm.News, 1978, pp. 5787, 6320, 6321.

The Supreme Court in *Tinker v. Colwell, supra,* formulated a definition of "malicious", as used in § 17(a) of the Act, as follows:

"We think a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception." *Tinker v. Colwell, supra,* at 487, 24 S.Ct. at 509.

The comments in the Legislative History of § 523(a)(6) directed attention to that portion of the *Tinker* decision dealing with the term "willful" in requiring that the conduct be shown to be deliberate or intentional. Nowhere in the Legislative History is there any indication of any intention to depart from the definition of "malicious", as used in the prior Act. *In re Langer,* 12 B.R. 957 (D.C.N.D.1981); *In re Adams,* 21 B.R. 301 (Bkrtcy.N.D.Oh.1982).

▆ The Legislative History has been interpreted by some courts to require a showing of specific intent to do harm in establishing the element of "maliciousness." *In re Tanner,* 17 B.R. 201 (Bkrtcy.W.D.Ky. 1982); *In re Hawkins,* 6 B.R. 97 (Bkrtcy.W. D.Ky.1980); *In re Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va.1980). However, my view of the Legislative History and the case authority following thereafter, together with the current definition by *Collier,* convinces me that "malice" means an act which is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." See, *In re Adams, supra,* and *In re Langer, supra.*

▆ Thus, if the actions of the debtor were committed deliberately or intentionally, and were wrongful and without just cause or excuse, the elements of "willful and malicious" are established.

▆ Additionally, the law will imply malice if a person of reasonable intelligence knows that the act in question is contrary to commonly accepted standards of conduct. *Matter of Friedenberg,* 12 B.R. 901 (Bkrtcy. N.Y.1981). The act must also necessarily cause injury to come within the exception of willful and malicious conduct. *Tinker v. Colwell, supra;* see, also, *Vickers v. Home Indemnity Co.,* 546 F.2d 1149 (5th Cir.1977).

An examination of the terms "deliberate or intentional" reflects its definition to mean "done with the will or intentionally, and not inadvertently or negligently ... Intent to do the wrongful act is sufficient and that constitutes the willful part of the act..." *In re McGiboney,* 8 B.R. 987 (Bkrtcy.N.D.Ala.1981).

The debtor contends that her actions were not deliberate or intentional and, thus, not "willful" because she was allegedly suffering from premenstrual syndrome. She argues that she was unable to exercise her will, and that she was not able to formulate any intent. As she testified, it was as if "someone else took over" her body. She would have the Court believe she was totally out of control as a result of her confusion, anxiety and hysteria. However, this is simply not borne out by the weight of the evidence.

The evidence indicated numerous other acts of violence disassociated from any cycle. The action in this case, as well as many prior acts, was planned and deliberated before it was committed. The knife used against the plaintiff was purposefully concealed in Irvin's sock and taken to the counselling session. There was testimony that Irvin was manipulative and had the ability to control herself even under stressful situations when in public. She also claimed the self-professed ability of using psychiatry to

excuse her conduct. This individual demonstrated a long history of a generally violent nature regardless of any menstrual cycle. She tended to blame others for her conduct. It is sometimes difficult to tell when Irvin's acts are the result of impetuous anger or the result of planned jealous revenge. The act in this case has elements of planning and deliberation, both before and after the stabbing. Finally, perhaps the most dispositive evidence is the lack of credible medical opinion stating that, to a reasonable degree of medical certainty, Irvin's acts were the product of her impaired ability resulting from premenstrual syndrome.

Dr. LaFleur testified that the theory of PMS is very new in the medical profession, it is highly controversial and there is little literature on the subject. Dr. Muller, the psychiatrist, admitted that the DSM III, relied upon by psychiatrists in the diagnosis of psychiatric disorders, doesn't even recognize PMS as a mental problem. He also pointed out that the psychiatric profession is still in disagreement regarding many aspects of PMS. Based upon a rather sketchy history of Irvin, Dr. Muller could only state that Irvin suffered an impaired ability, to the extent of about 25 to 30% of normal, to think out and form logical decisions. He did not state that her conduct was the probable result of premenstrual syndrome. He did not state that Irvin was unable to control her actions on the occasion in question.

Dr. Farinholt, the OB–GYN, felt that "almost every lady who menstruates", suffers to one degree or another from premenstrual syndrome. However, except in the rarest of cases, it is not disabling. No expert in this trial opined that PMS is an excuse for violence.

■ The scientific evidence relating to PMS and its application here is too sketchy, inconclusive, and unreliable to be accepted as an explanation for otherwise willful and malicious conduct. Application of premenstrual syndrome as a defense would require two things. First, the premise upon which any such scientific theory is based must have achieved general acceptance in the medical community; and secondly, there must be evidence that, to a reasonable degree of medical certainty, the conduct was proximately caused by this medical disorder.

In *U.S. v. Brown*, 557 F.2d 541 (6th Cir. 1977), the court was called upon to decide if ion microprobic analysis (hair comparison) should be accepted as a valid scientific theory. In rejecting testimony relating to that theory, the court stated as follows:

"A necessary predicate to the admission of scientific evidence is that the principle upon which it is based 'must be sufficiently established to have gained general acceptance in the particular field to which it belongs.'" *U.S. v. Brown, supra,* at page 556.

The court then equated general acceptance in the scientific community with a showing that scientific principles and the procedures upon which expert testimony was based is reliable and sufficiently accurate, without requiring absolute certainty. The court declined to accept the testimony, nothing that research had failed to disclose a single reported case where such testimony had been held to be admissible, and the parties could provide no cases, reported or unreported, where the court had admitted evidence based on ion microprobic analysis. There was nothing in the record which indicated the analysis may achieve a reliable and meaningful result and there was no published scientific authority advocating the merits of the theory. In conclusion, the *Brown, supra,* court stated: "While it is a truism that every useful new development must have its first day in court, ... expert testimony on a critical fact relating to guilt or innocence is not admissible unless the principle upon which it is based has attained general acceptance in the scientific community and is not mere speculation or conjecture." *U.S. v. Brown, supra,* at page 558.

The Tenth Circuit Court of Appeals has considered the issue of scientifically reliable evidence in *U.S. v. Bennett*, 539 F.2d 45 (10th Cir.1976), and *U.S. v. Pino*, 606 F.2d 908 (10th Cir.1979). In *Bennett, supra,* lit-

tle legal analysis was directed to the admissibility of expert testimony on the state of mind of the defendant at a particular time. The Court stated, at page 53, "In view of the nature of the proof offerred and the somewhat vague scientific reasons for the testimony, we are satisfied that there was no error in the trial court's determination that the proof should be excluded."

In *Pino, supra,* the court was faced with the question of whether to admit psychiatric testimony aimed at proving the defendant's personality and behavior patterns were such that, when he was intoxicated, he would not be disposed to act recklessly. The Court determined as follows:

"The trial court must be satisfied that the proof offered is grounded in sufficient scientific support to warrant its use in the courtroom and the court must decide whether it would aid the jury in deciding the ultimate issues." *U.S. v. Pino, supra,* at page 918.

In the instant case, the testimony was admitted over the vigorous objection of plaintiff. Likewise, extra judicial research relating to literature involving PMS was received by the court over the equally vigorous objection of the plaintiff. That testimony and the literature simply confirm that too much uncertainty still surrounds the study of PMS for it to be considered a generally accepted theory. Its cause and its behavioral influence are not sufficiently established to serve as a defense to the defendant's conduct in this matter.

No evidence was presented to indicate that the theory of premenstrual syndrome has ever been admitted as a defense to criminal conduct or an intentional tort in a United States Court before. It has never been accepted as a mitigating factor in a reported criminal case in this country.

None of the witnesses in this action offered much in support of or in opposition to any of the available literature or current research on PMS. Thus, the record is devoid of authority in this regard. However, defendant has submitted a brief containing citations to much of the research, and has provided the Court with a bibliography of current material on the subject of PMS and its affect on female behavior.[1] This was received over the plaintiff's objection. These authorities confirm that the subject is still controversial and not yet developed to the point where the information is considered reliable enough to be generally accepted in the psychiatric profession.

The medical profession apparently first began to recognize premenstrual syndrome as a specific psycho-physiological disorder in about 1953. *Suarez Murias, The Psychophysiologic Syndrome of Premenstrual Tension With Emphasis On The Psychiatric Aspect,* 166 Int'l. Rec. of Medicine and GP Clinics, 475 (1953). It has been found that the physical symptoms of PMS may cause psychological symptoms resulting in obvious personality alterations, such as recurrent frenzy, catatonic-like depression, schizophrenia, hallucinations and epileptiform seizures. Wallach & Rubin, *Premenstrual Syndrome and Criminal Responsibility,* 19 U.C.L.A. Law Review 209 (1972).[2] See, also, *Once A Month,* by Katharina Dalton, M.D., Hunter House, Inc., Publishers, 1979.

1. Defendant submitted a bibliography of various authorities as attachments to her brief. These are as follows: *Once A Month,* by Katharina Dalton, M.D., Hunter House, Inc. Publishers, (1979); *Premenstrual Syndrome: An Ancient Woe Deserving of Modern Scrutiny,* by Elizabeth Rasche Gonzalez, Journal American Medical Association (JAMA), Vol. 245, No. 14 (April 10, 1981); *It Happens Every Month,* by Joy Krause, the Milwaukee Journal, August 11, 1980; *Premenstrual Syndrome,* by Robert L. Reid and S.S.C. Yen, *American Journal of Obstetrics and Gynecology,* Vol. 139, page 85 (1981); *Women on Trial: New Defense,* by Joseph R. Tybor, the National Law Journal, February 15, 1982.

2. The UCLA Law Review by Wallach and Rubin cites to many references from 1938 into the 1980's exploring premenstrual syndrome and its possible role in resultant criminal behavior in women. It reviews the physical and emotional symptoms and the psychological and personality disturbances which may result in sufferers of PMS. It does not purport to proclaim general acceptance in the medical community of PMS as a defensible explanation for criminal or tortious conduct.

Dr. Katharina Dalton, of the premenstrual clinic, University College Hospital in London, England, is a frequently-cited authority in the diagnosis and treatment of premenstrual syndrome. Dalton's books and articles have included considerable discussion about the relationship between PMS and criminal responsibility in women.[3] In her book, *Once A Month,* Hunter House, Inc., Publishers (1979), she states, at page 12: " 'The Premenstrual Syndrome' is used to embrace any symptoms or complaints which regularly come just before or during menstruation but are absent at other times of the cycle." The evidence in this action indicates many incidents of violence occurring at various irregular times in the cycle, apparently having nothing to do with menstruation.

Another authority cited by the defendant is Ried and Yen, *Premenstrual Syndrome,* 139 *Am. Journal of Obstetrics & Gynecology,* 85 (1981). This article specifically notes that "although the pathogenesis of this disorder remains speculative, the weight of evidence supports the premise that PMS is related to an aberration in the cyclic function of the hypothalmic, pituitary-ovarian axis." Thus, although it is recognized that there is much evidence to connect PMS to aberrant conduct, its pathogenic analysis remains speculative.

Given the present knowledge of PMS, it is not surprising that it has not yet been accepted in the U.S. as a defense to criminal conduct or intentional torts. However, Dr. Dalton's testimony in two criminal trials in England did result in reduced sentences for two women defendants, who were PMS sufferers, convicted of assault and homicide.[4] It is important to note that PMS was ac-

cepted in mitigation of punishment, not in defense of the substantive crime.

An article appearing in the Journal of the American Medical Association, entitled *Premenstrual Syndrome: An Ancient Woe Deserving of Modern Scrutiny,* JAMA, Vol. 245, No. 14, p. 1393 (April 10, 1981), by Elizabeth Rasche Gonzalez, cites to the work of Katharina Dalton, and states: "Another reason Dalton's work has been ignored or discounted is that it has never been subjected to controlled studies. She herself has not conducted such studies, and other investigators have not shown interest in doing so."

This article then notes that even Dalton cautions that there may be many misdiagnoses of PMS. "It is clear that many scientific questions remain regarding PMS." *Premenstrual Syndrome: An Ancient Woe Deserving of Modern Scrutiny, supra,* at page 1396.

■ The evidence and testimony in the instant case establishes that the conduct of the debtor-defendant, Jamie Irvin, was willful and malicious. There is insufficient evidence presented in the within action to establish that premenstrual syndrome is sufficiently defined and accepted in the medical community to be an acceptable defense. Further, this debtor's history of violent conduct is not fully explained by premenstrual syndrome and there was no competent evidence to establish that her conduct on the occasion in question was proximately caused by this disorder.

There may well be a circumstance in the future where sufficient expertise and background establishes premenstrual syndrome as a legitimate defense to criminal or tortious conduct committed by an unfortunate

3. See, e.g., *Once A Month, supra; The Premenstrual Syndrome* (joint authorship with Raymond Greene), British Medical Journal, Vol. i, p. 1007 (May 9, 1953); *Menstruation and Crime,* British Medical Journal, Vol. ii, pp. 1752–1753 (December 30, 1961); *Menstruation and Accidents,* British Medical Journal, Vol. ii, pp. 1425–1426 (November 12, 1960); *Premenstrual Syndrome,* update, pp. 121–128 (July, 1975); *Premenstrual Syndrome With Psychiatric Symptoms,* Journal of the American Medi-

cal Association, Vol. 238, No. 25, p. 2729 (December 19, 1977); *Cyclical Criminal Acts in Premenstrual Syndrome,* The Lancet, pp. 1070–1071 (November 15, 1980).

4. The use of PMS as a defense, including a discussion of Dalton's testimony regarding these cases, is reviewed by Tybor, *Women on Trial: New Defense,* The National Law Journal (February 15, 1982).

sufferer from this medical difficulty. However, this is not that circumstance.

### JUDGMENT

Based upon the foregoing analysis and the testimony and evidence in the within action, it is my determination that the plaintiff has established by clear and convincing evidence that the judgment obtained by the plaintiff against the debtor-defendant in the State Court in the amount of $5,200.00, together with interest at the legal rate thereon, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). Accordingly, judgment shall enter in that amount, together with taxable costs herein, in favor of the plaintiff and against the defendant.