NATHAN JACOBSON, APPELLANT, v. MARTIN STERN, JR., RESPONDENT.

No. 9898

January 16, 1980 605 P.2d 198

[Rehearing denied March 4, 1980]

*David Hamilton,* Reno, *Simon & Sheridan,* Los Angeles, California, for Appellant.

*Cromer, Barker & Michaelson and Victor Alan Perry,* Reno, for Respondent.

---

[2]The Chief Justice designated THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in this case. Nev. Const. art 6, § 19; SCR 10 and 11.

## OPINION

*Per Curiam:*
This action was brought by Martin Stern for architectural

.

services rendered to Nathan Jacobson in Jacobson's development of a hotel and casino, known as the Kings Castle, on the north shore of Lake Tahoe, Nevada. These parties were involved in two projects during the time involved in this action: the Bonanza in Las Vegas and the Kings Castle in Incline Village. The case at bar concerns only the Kings Castle project.[1]

In January, 1969, Jacobson contacted Stern and asked him to draw plans for Jacobson's new hotel/casino at Lake Tahoe. Stern immediately began preliminary work on the project and contacted soil engineers and surveyors in this regard. At this time Stern dealt directly with Jacobson, who referred to the project as "my hotel", and with Taylor of Nevada which was to be the general contractor.

On February 18, 1969, Stern wrote to Jacobson detailing, among other things, the architect's services and the fee. Stern's plans were subsequently discussed by the two men and Stern's fee was agreed to be $250,000. Stern was told by Jacobson to proceed, and he completed the preliminary plans by March, 1969. The highrise foundation plans were finished on May 1, 1969, and the scope of the work plans were initiated on May 6, 1969. Stern testified at trial that by May 6, 1969, at least 60 percent of the architectural services were complete, and the architectural plans and drawings were completed by July 31, 1969. At trial, Jacobson disagreed with these figures, since the theatre and dining room had to be redrawn, but he did not give his own estimate. A letter from Jacobson to Stern, written March 10, 1970, acknowledges that the parties entered into a contract in April, 1969, but no written contract was ever admitted into evidence despite Jacobson's testimony that such a document was executed.

At the same time as the plans for the building were being developed by Stern, Jacobson was negotiating financing and setting up business structures to own and manage the property. On May 1, 1969, Jacobson acquired all of the stock of A.L.W., Inc., a corporation which had previously operated a casino on this site, and which was to operate the Kings Castle. Levin-Townsend Computer Corporation subsequently purchased 20 percent of the A.L.W., Inc. stock for $300,000. On May 9, 1969, a business structure for ownership of Kings Castle was set up and a number of documents were executed. The business structure included the formation of Lake Enterprises, a corporation of which Jacobson was the sole stockholder and president. Kings Castle, Limited Partnership was formed with Lake

---

[1]See also Bonanza Hotel v. Bonanza No. 2, 95 Nev. 463, 596 P.2d 227 (1979).

Enterprises Inc. as the general partner and Jacobson and others as limited partners. Jacobson was the most substantial investor in Kings Castle, Limited Partnership, with investments in excess of $3 million.

After May 9, 1969, A.L.W., Inc. operated the hotel and casino and Kings Castle, Limited Partnership, leased the land. All monies were subsequently paid and received through these two entities. Stern billed Jacobson beginning in June of 1969. Some of the billings were disputed, but Stern was in fact paid $30,000 on June 13, 1969; $30,000 on August 11, 1969; $58,000 on September 12, 1969, and $32,000 on October 17, 1969. All of the checks were drawn on the account of A.L.W., Inc.; only one of the checks was signed by Jacobson.

The Kings Castle opened in July 1970. On February 3, 1972, A.L.W., Inc., as owner of Kings Castle and Casino, filed its petition for arrangements under Chapter XI of the Bankruptcy Act. Stern did not file a claim in that proceeding.

This case was set for trial November 17, 1975. On the first day of trial Jacobson's attorney was unable to be in court and co-counsel requested a continuance. The judge granted the continuance but, as a condition, allowed a fee of $2,000 to be given to Stern for his costs of delay. Later, after a three week trial, judgment was rendered for Stern in the amount of $132,590.37, plus interest.

In this appeal Jacobson contends: (1) that there was insufficient evidence presented at trial to support the judgment of his personal liability; (2) that the obligations of Jacobson were adopted by A.L.W., Inc., and that such adoption constituted a novation; and, (3) that it was improper for the court to assess costs against Jacobson for a continuance of the trial.

1. Appellant contends there is no evidence to support the district court's findings that Stern was not dealing with any of the existing corporate entities; Levin-Townsend Computer Corporation; Bonanza No. 2; J.J. Enterprises;[2] Jacobson as agent for any of these; or with Jacobson as agent for Kings Castle or any other principal.

The evidence shows that Jacobson was, in the early months of 1969, President of J.J. Enterprises, which wholly owned Bonanza No. 2, and Chairman of the Board of Caesar's Palace. There is no evidence, however, that at that time Jacobson was acting on behalf of any of these entities in contracting for the building of Kings Castle Casino, and this is born out by the fact that none of these entities subsequently became involved with the Kings Castle Casino. Although Stern may have known

[2]These corporations were involved in the Bonanza project in Las Vegas.

of Jacobson's affiliations, and known that many of the same people who owned and managed the Bonanza were involved in the Kings Castle project, there is little evidence, if any, that he contracted with Jacobson in any capacity connected with those existing corporations. There is no evidence the Levin-Townsend Computer Corporation had anything more than a 20 percent ownership interest in A.L.W., Inc. The record is also devoid of evidence that they were involved with Stern directly, or that Jacobson ever represented them in negotiations with Stern.

Kings Castle, Limited Partnership, and Lake Enterprises, Inc., did not exist until May 9, 1969. A.L.W., Inc. existed from 1965, but Jacobson had no connection with it at all until he purchased the stock on May 1, 1969. The contract for architectural services, which was certainly for the benefit of A.L.W., Inc. and Kings Castle, Limited Partnership, was made before May 1, 1969. Stern maintains that he had a contract with Jacobson from February 18, 1969, and Jacobson admits a contract as of April 1969, but in any event the contract was in existence before Kings Castle, Limited Partnership, and Lake Enterprises, Inc., and before Jacobson's involvement with A.L.W., Inc. Thus, none of these corporations could contract, or have Jacobson contract for them because they were not yet organized. Peters Grazing Association v. Legerski, 544 P.2d 449 (Wyo. 1975).

Appellant, citing Gillig & Co. v. Lake Bigler Road Co., 2 Nev. 214 (1866), further argues that a course of conduct between the parties created a presumption that Jacobson was acting as agent of J.J. Enterprises, as owner of the Bonanza. The record supports the determination that there was no course of dealing or custom and practice between these parties which would tend to establish Jacobson's agency for J.J. Enterprises in his relationship with Stern in the Kings Castle.

In the absence of any evidence to the contrary, and in the presence of testimony by Stern that he thought he was dealing with Jacobson as an individual, the district court concluded that the contract was made between Jacobson, as promoter of the Kings Castle project, and Stern. A contract with the promoter is not one with the corporation absent some subsequent corporate act or agreement. Paxton v. Bacon Mill & Mining Co., 2 Nev. 257 (1866); Peters Grazing Association v. Legerski, *supra*. Thus, the district court properly found Jacobson, as promoter, liable on the contract.

2. Under Nevada law, if a pre-incorporation contract made

by a promoter is within the corporate powers, the corporation may, when organized, expressly or impliedly ratify the contract and, thus, make it a valid obligation of the corporation. Chartrand v. Barney's Club, Inc., 380 F.2d 97 (9th Cir. 1967). If the corporation accepts the benefits of the contract, it will be required to perform the contractual obligations. *Id*. The evidence supports a finding that the A.L.W. corporation accepted the benefits of the contract for architectural services, and in fact adopted the contractual obligations and made partial payments on the obligation. However, liability of the corporation by adoption does not, absent a novation, end the liability of the promoter to the third party. Allen Steel Supply Co. v. Bradley, 402 P.2d 394 (Idaho 1965).

Appellant argues that there was, in fact, a novation by A.L.W., Inc. in its adoption of all agreements as its corporate liabilities. Where there is a valid express or implied novation, the corporation is substituted for the promoter as a party to the contract in all respects, and the promoter is divested of his rights and released of his liabilities. Decker v. Juzwik, 121 N.W.2d 652 (Iowa 1963); *see* Williams v. Crusader Disc. Corp., 75 Nev. 67, 334 P.2d 843 (1959). In order to constitute a valid novation, however, the creditor must assent to the substitution of a new obligor, but this assent may be inferred from his acceptance of part performance by the new obligor, if the performance is made with the understanding that a complete novation is proposed. Nev. Bank Comm. v. Esquire R.E., Inc., 86 Nev. 238, 468 P.2d 22 (1970).

Appellant contends that, because the evidence shows that after May 1, 1969, Stern probably knew, or should have known, that he was performing for the benefit of A.L.W., Inc., and was paid by A.L.W., Inc., he impliedly consented to a novation. There is no evidence, however, showing that Stern agreed to the substitution of A.L.W., Inc. for Jacobson in the contract, or that he performed with the knowledge or understanding that a novation was proposed. *See* Nev. Bank Comm. v. Esquire R.E., Inc. *supra*. In fact he maintained throughout that he had contracted with Jacobson and felt that Jacobson was personally liable on the contract. The intent of the parties to cause a novation must be clear. Zuni Constr. Co. v. Great Am. Ins. Co., 86 Nev. 364, 468 P.2d 980 (1970). *See* Bank of Fairbanks v. Kaye, 227 F.2d 566 (9th Cir. 1955); Allen Steel Supply Co. v. Bradley, *supra*. The trial court found there was no novation and that Stern never agreed to release Jacobson from his obligations. We agree with this finding.

3. Appellant, citing Sun Realty v. District Court, 91 Nev. 774, 542 P.2d 1072 (1975), argues that the district court erred in imposing sanctions on Jacobson ordering him to pay respondent's cost of delay. *Sun Realty,* however, involves an act of the court taken without authority by rule or statute. The act taken by the court in the case at bar was clearly permitted by the local District Court Rules, approved by this court. The Rules of Practice for the Second Judicial District Court of the State of Nevada provided that "[a]t the time of trial all parties shall have completed all discovery procedures and be ready for trial." D.C.R. 4D. Rule 9 of those rules further provided, in pertinent part:

> If a party or an attorney fails or refuses to comply with these rules, the court may make such orders and impose such sanctions as are just, including, but not limited to, the following:
>
> . . . .
>
> (b) Continue any hearing until the disobedient party or attorney has complied with the requirements imposed, to pay the other party his expenses, including a reasonable attorney's fee, incurred in preparing for and attending such hearing.

Thus, *Sun Realty* does not apply in this instance and the district court acted within its authority.

Accordingly, the judgment of the district court is affirmed.

MOWBRAY, C. J., THOMPSON, MANOUKIAN, and BATJER, JJ., and ZENOFF, SR. J.,[3] concur.