In re Dennis Eugene SINGLETON,
Debtor.

SECURITY BANK OF NEVADA,
Plaintiff,

v.

Dennis Eugene SINGLETON, Defendant.

Bankruptcy No. BK–R–83–125.
Adv. No. 83–217.

United States Bankruptcy Court,
D. Nevada.

Feb. 21, 1984.

Rene E. Feinstein, Chubb & Feinstein, Reno, Nev., for plaintiff.

Dennis Eugene Singleton, in pro per.

## Memorandum Decision

ROBERT C. JONES, Bankruptcy Judge.

### Introduction

This adversary proceeding was filed by plaintiff Security Bank of Nevada (Bank) to determine the dischargeability of a debt incurred by the debtor, one of its former customers. For the reasons detailed below, the Court concludes the debt is nondischargeable.[1]

### Facts

In November 1981 (the exact day is not apparent from the evidence) the debtor opened a checking account with the Bank's Riverside (Reno) Branch Office and obtained a "check-cashing" or "check guarantee" card. Beginning on 21 November 1981 and ending on 8 December 1981 the debtor pursued an ambitious program of check-cashing with the indispensable aid of his guarantee card. Over this two and one-half week period the debtor drew 69 checks on his account, including a single-day high of 14 checks. All but a handful of these checks were written to Reno area casinos and all but two were for $100 or less. The dollar amount of the checks is significant because one of the principal conditions for use of the guarantee card required the checks to be written for $100 or less. Other conditions for use of the card were set forth on the back of the card.[2]

---

1. This memorandum decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

2. Generally, the Bank guarantees payment of all checks payable to or endorsed by an established Nevada business if the checks are not post-dated, the card is presented (and shows the cardholder's authorized signature) with the check, and the card's number is recorded on the back of the check. These conditions include no limitation on the number of checks to be drawn, although the debtor testified he thought the Bank would honor no more than one $100.00 check per week.

At trial, the debtor testified that he knew at the time the checks were written that he had insufficient funds in his checking account. (Indeed, it appears from the evidence that the Bank ultimately had to "guarantee" all of the checks out of its own funds.) However, the debtor asserted in his defense that he had a potential source of money to support the checking account draws. This "mystery" money was instead squandered on bacchanalian delights or, as he described it, on "drinking and gambling." This appears to have been the same fate suffered by those funds received by way of the checks written to the casinos and bars, which totalled some $6,550.00 (including one $200.00 check payable to "cash").[3] The total dollar amount of the 69 checks was $6,799.75.

Once the Bank discovered this flurry of activity and the insufficient funding of the checking account, the manager of the Riverside Office immediately attempted to contact the debtor and recover the check-cashing card. After three or four days, a meeting was arranged and the card was returned to the Bank's custody and control. During this meeting, the debtor expressed regret for his actions and said he would obtain money from his uncle to reimburse the Bank. Although some money was paid to the Bank, the debtor's insolvency prevented the payment of the debt and no other source of money was found. Ultimately the branch manager had the debtor execute a $6,500.00 promissory note dated 20 January 1982, which carried an interest rate of the prime plus two percent (then 22 percent per annum). The note's terms called for six successive payments of $300.00 per month beginning on 20 February 1982, with the balance due on 20 July 1982. The debtor made some payments on this note, although they were generally late and less than the minimum payment required, and the note was later revised to extend the maturity date to 30 January 1983 and to lower the minimum monthly payments to $200.00 (although the interest rate was increased to the prime rate plus

four percent). Notwithstanding these attempts to accommodate the debtor's financial circumstances, the payment schedule was not met and he finally resorted to filing a Chapter 7 bankruptcy petition, upon the advice of counsel. Since the 11 February 1983 petition date the note has been in default.

On 9 May 1983 the plaintiff filed this adversary proceeding alleging that the balance owed of $5,860.56 is nondischargeable because it is a debt incurred by "fraud" and "larceny in that [the debtor] willfully converted the funds of Security Bank of Nevada with knowledge that he would not be able to restore said funds to [the Bank]." Plaintiff's complaint, p. 3. Plaintiff also alleges the debt is excepted from discharge because the debtor's conduct constituted a willful and malicious injury to the Bank's property.

On 17 June 1983 the debtor, through counsel, answered the complaint by admitting that he owed the plaintiff $5,860.56, but denying that his conduct amounted to a fraud. As an affirmative defense, the debtor represented that "[p]laintiff's conduct in executing an unsecured promissory note with defendant and thereafter accepting payments upon such created an unsecured debt ... dischargeable under the Bankruptcy Code." Answer, pp. 2–3. The Court characterizes this as the debtor's "novation defense." Prior to trial, debtor's counsel withdrew with his client's consent, and the debtor chose to represent himself at trial.

*Issues*

1) Did execution of the promissory note constitute a novation, thereby discharging the underlying alleged tort obligation and converting the debt into a simple dischargeable, unsecured claim?

2) Is the subject debt excepted from discharge pursuant to Bankruptcy Code §§ 523(a)(2)(A) or 523(a)(6)?

*Discussion*

1) *Novation*

Nev.Rev.Stat. § 104.3802 (1979) (Uniform Commercial Code § 3–802) provides that

---

**3.** Apparently the Bank paid this $200.00 check    also.

unless the parties otherwise agree, when an instrument such as the promissory note executed here "is taken for an underlying obligation ... the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation ...." Therefore, unless the debtor and the Bank expressly agreed to a discharge of the underlying obligation, such as through a novation, it was merely suspended until the note became due; thereby giving the debtor/maker valuable time to satisfy an obligation that otherwise would be immediately due and payable. *See* J. White & R. Summers, *Handbook of the Uniform Commercial Code,* § 13–20 (2d ed. 1980).

■ Although the debtor alleged in his answer that a new, dischargeable obligation was created by the promissory note and testified at trial that he considered the Bank's debt as being based on an unsecured loan,[4] he presented no evidence of an agreement to discharge the underlying obligation. Of necessity, the intent to cause a novation—the agreement to extinguish an old obligation and substitute a new one—must be clearly established. *Jacobson v. Stern,* 96 Nev. 56, 605 P.2d 198 (1980). Rather than discharging the underlying obligation based on the overdrawn checking account, the promissory note, at most, merely became evidence of the underlying debt. *See General Insurance Co. of America v. Klein,* 517 S.W.2d 726 (Mo.App.1974).[5]

### 2) Dischargeability

#### A. False pretenses, false representation, or actual fraud

■ Bankruptcy Code § 523(a)(2)(A)[6] is the successor to the discharge exception found in former Bankruptcy Act § 17a(2), 11 U.S.C. § 35 (repealed 1979), which excepted "those frauds which [were] involved in the obtaining of money or property by 'false pretenses or false representations.'" 1A *Collier on Bankruptcy* ¶ 17.16[3] at 1633 (14th ed. 1978). The concensus of decisions rendered under both the Act and the Code establish the elements of a § 523(a)(2)(A) exception as:

1) the debtor made representations;

2) that at the time he knew the representations were false;

3) that he made them with the intention and purpose of deceiving the creditor;

4) that the creditor relied on such representations; and

5) that the creditor sustained the alleged loss and damage as the proximate result of the representations.

*In re Houtman,* 568 F.2d 651 (9th Cir.1978); *In re Hunt,* 30 B.R. 425 (D.C.M.D.Tenn. 1983); *In re Ciavarelli,* 16 B.R. 369 (Bkrtcy. E.D.Pa.1982) (lists three elements that incorporate or presume the five listed above); 3 *Collier on Bankruptcy* ¶ 523.08[4] at 523–40–42 (15th ed. 1983).[7] As the language

---

**4.** The debtor said, in part: "I filed bankruptcy only on this promissory note. I paid on it as long as I could for a year. It was not on the checks themselves—I paid on a personal, unsecured loan that Security Bank had given me. When I no longer could afford to pay and had fallen so far behind, ... I was advised to file bankruptcy."

**5.** *Cf. Greenberg v. Schools,* 21 B.R. 1011 (D.C. S.D.Fla.1982) *aff'd* 711 F.2d 152 (11th Cir.1983) (a debt which originates from debtor's fraud should not be discharged simply because the debtor entered into a settlement agreement).

**6.** 11 U.S.C. § 523:
  (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—....

  (2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
    (A) false pretenses, a false representation, or actual fraud, .....

**7.** In *Matter of Schnore,* 13 B.R. 249 (Bkrtcy.W. D.Wis.1981), the court attempted to draw a distinction between "false pretenses" and "false representation," but concluded that the reported decisions generally do not draw a distinction. Instead, the court observed that "[i]t seems useful to consider the § 523(a)(2)(A) exception as involving debts obtained by 'false pretenses,' since this is the broader term and can be read to include both express and implied representations." *Id.* at 252. The court then summarized the elements as being substantially similar to those used here.

and requisite elements of former § 17a(2) and present § 523(a)(2)(A) are very similar the cases decided under the predecessor statute may be profitably consulted for direction in deciding cases under current law.

Courts have repeatedly held that "whenever a credit card holder uses his credit card, he is representing that he has both the ability and intention to pay for those purchases and the credit card issuer relies on those implied representations in extending credit to the card holder." *In re Ciavarelli,* 16 B.R. at 370. *Accord In re Black,* 373 F.Supp. 105 (E.D.Wis.1974) (Act case); *In re Engstrom,* 1 B.C.D. 17 (Bkrtcy.S.D.Iowa 1973) (Act case); 3 *Collier on Bankruptcy* ¶ 523.08[4] at 523-45 (15th ed. 1983) ("A misrepresentation by the debtor of his intention ... may constitute a false representation within the exception. Thus, a purchase of goods on credit by a debtor who does not intend to pay therefor, constitutes false representation....").[8] In the context of issuing checks without sufficient funds, a Bankruptcy Appellate Panel of the Ninth Circuit has held that when the debtor knows or should have known there were insufficient funds, the tendering of checks is an "implicit representation" that the checks are good—a representation that is false. *In re Kurdoghlian,* 30 B.R. 500, 502 (Bkrtcy.App. 9th Cir.1983). The Panel further concluded that under the facts of that case the debtor intended to deceive the creditor when the checks were issued, and thereby obtain securities without the intention of paying for them. The Panel reversed the lower court's judgment declaring the debt dischargeable and remanded the case for necessary factual findings.

In this district the issue of implied misrepresentations has arisen in a slightly different context. In *Matter of Schneider,* 3 B.C.D. 175 (Bkrtcy.D.Nev.1977), the Court held a credit card debt nondischargeable because it was incurred by the debtor after she consulted bankruptcy counsel. Judge Goldwater concluded it was "deceitful" for the debtor to use the credit card once she had determined she might not pay the debt if she filed for bankruptcy. By not having "good intentions" to pay "she was at the very least deceiving her creditors by giving a false impression that she intended to pay.... The representation here is implied and symbolic and constitutes false pretenses." *Id.* at 176.

■ Analogous to both the credit card and bad check cases is the circumstance found here. One using a check-cashing card impliedly represents to the issuing bank [9] that it intends to have sufficient funds in the account to cover the checks written or, at the very least, promptly reimburse the bank for any funds advanced to cover the "guaranteed" checks. At the time the debtor made these implied representations in November and December 1981 he knew them to be false: he admitted having woefully insufficient funds in the account and had no realistic prospects of obtaining the thousands of dollars necessary to repay the Bank. The falsity of his representations is also demonstrated by those facts showing he intended to deceive the Bank.

Often the most difficult obstacle to surmount in such cases is proving by clear and convincing evidence, *In re Huff,* 1 B.R. 354 (Bkrtcy.D.Utah 1979), that the debtor made representations with the intent and purpose of deceiving the creditor into providing merchandise, credit, or, as in this case, overdraft protection (which may be characterized as a species of short-term credit). Naturally the debtor's testimony at such a trial will usually support an intention to pay, but the finder of fact may disregard such self-serving or incredible testimony and, instead, consider the circumstantial evidence of

---

**8.** Collier recognizes a contrary minority position shown in such cases as *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940). 3 *Collier, supra,* at 523-45 n. 20.

**9.** Of course, any such implied representation to a merchant is not germane because the merchant will usually sustain no damages nor have any other cause to complain—if the card's conditions for use are met, the drawee bank honors the check regardless of the checking account balance. Therefore, the merchant is not the ultimate victim of the fraud.

fraudulent intent. The marshaling of these external facts is often the only way such an intent is proved. Some factors usually considered in "shopping spree" cases include:

1) the length of time between the charges and the filing of bankruptcy;

2) whether or not an attorney was consulted concerning the filing of bankruptcy before the charges were made;

3) the number of charges;

4) the amount of the charges;

5) the financial condition of the debtor at the time the charges were made; and

6) whether the charges were above the credit limit of the account.

*In re Stewart,* 7 B.R. 551, 555 (Bkrtcy.M.D. Ga.1980). This is not to say all of these or other possible indicia need be present; rather, one or two may suffice to convince the court that a fraudulent intent exists if the facts make out an egregious case.[10] Such is the case here.

While it is generally agreed that the use of a check drawn on insufficient funds alone "is not conclusive evidence of an intent to defraud within § 523(a)(2)(A)," *In re Collins,* 28 B.R. 244, 247 (Bkrtcy.W.D.Okl. 1983), the supplemental facts here lead clearly and convincingly to the conclusion that the debtor intended to defraud the Bank. The pattern of repeatedly drawing checks within the guarantee limit[11] commenced shortly after the checking account was opened and covered a relatively short span of time. The checks were written almost exclusively to casinos for apparently no purpose other than gambling and while the debtor knew there were insufficient funds in the account. The debtor's testimony that he intended to put money into the account and that he thought the Bank was obligated to honor but one check a week is wholly incredible considering the placement of the card's conditions on the reverse of

the card and the debtor's inability or failure to divulge the intended source or amount of any money for the account.

In essence, the tort in this case amounts to a fraudulent concealment of an intention not to pay, rather than an express misrepresentation of an intention to pay. The Bank reasonably relied on the false implied representation and continued to allow use of the card until its own records prompted action to recover the card from the debtor. That the Bank was damaged in the amount pleaded is also clear—the debtor having admitted to the $5,860.56 debt as being due. Under these facts, all of the elements of a § 523(a)(2)(A) exception have been satisfied.

**B.** *Willful and Malicious Injury to Property*

11 U.S.C. § 523(a)(6), which excepts from discharge any debt arising from a "willful and malicious injury by the debtor to another entity or to the property of another entity," encompasses ground previously covered by former Act § 17a(2) that excepted debts for "willful and malicious conversion of the property of another." *Matter of Graham,* 7 B.R. 5 (Bkrtcy.D.Nev. 1980); 3 *Collier on Bankruptcy* ¶ 523.16[3] at 523–126–27 (15th ed. 1983). In order for the conversion of another's property to be characterized as willful and malicious, it must have been " 'without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury.' " *Matter of Graham,* 7 B.R. at 7, *citing* 3 *Collier on Bankruptcy* ¶ 523.16[1] at 523–116 (15th ed. 1979); *see also* 3 *Collier on Bankruptcy* ¶ 523.16[1] at 523–120 (15th ed. 1983). Further, "[a]n injury to an entity or property may be a malicious injury within

---

**10.** *See Matter of Perticaro,* 1 B.C.D. 1298 (Bkrtcy.E.D.N.Y.1975) (with the use of three credit cards, the debtor purchased over $24,-000.00 worth of goods in two and one-half months).

**11.** Much like the cases in which the debtor uses a credit card for numerous purchases all below

the "credit check" limit (usually $50.00), the use of the guarantee card in this case shows an intent to deceive. *See In re Engstrom,* 1 B.C.D. 17 (Bkrtcy.S.D.Iowa 1973) (during a one-month period the debtor made 35 separate charges, each less than the amount at which sales personnel were required to make a credit check).

this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill-will." 3 *Collier on Bankruptcy* ¶ 523.16[1] at 523–118 (15th ed. 1983) (footnote omitted); *see also In re Irvin,* 31 B.R. 251 (Bkrtcy.D.Colo. 1983) (actions need only have been intentional, wrongful, and without just cause or excuse to satisfy the requirements of § 523(a)(6)).

The injury to property alleged was the conversion of the Bank's property—the limited credit line that provided the debtor with overdraft protection. The discussion above has shown that the debtor's actions were intentional and calculated to deprive the Bank of its property without just cause or excuse. The wrongfulness of these actions is demonstrated by their fraudulent nature. *Cf. In re Whitehead,* 2 B.C.D. 1647 (Bkrtcy.D.Utah 1976) (court declined to find fraud in the use of a credit card that exceeded the credit limit, but did conclude that the debtor had willfully and maliciously converted the bank's lien of credit).

*Conclusion*

The plaintiff has met its burden of showing that the debtor's actions relating to the use of the check guarantee card justify the exception of this debt from the debtor's general discharge, pursuant to §§ 523(a)(2)(A) and (a)(6). The debt of $5,860.56 is nondischargeable. A separate judgment shall be entered concurrent with this memorandum.