**In the Matter of Robert Angelo MOCCIO, Debtor.**

**Adam H. ROESING, Plaintiff,**

**v.**

**Robert Angelo MOCCIO, Defendant.**

**Bankruptcy No. 82–08037.
Adv. No. 83–0162–TS.**

United States Bankruptcy Court,
New Jersey.

June 27, 1984.

On Complaint to hold debt nondischargeable pursuant to 11 U.S.C. sec. 523(a)(6)

AMEL STARK, Bankruptcy Judge:

The Plaintiff in this complaint charges that a $21,170.71 default judgment obtained against the Debtor in the Superior Court of New Jersey should be excepted from discharge under section 523(a)(6) of the Bankruptcy Code for the reason that the judgment was based upon a "willful and malicious" assault and battery against the Plaintiff by the Debtor. The Debtor concedes that he was involved in a "fight" with the Plaintiff, but contends that the Plaintiff willingly entered the fight and was not the innocent bystander he portrays himself to be. The primary difficulty facing the Court is to evaluate the credibility of the parties. The secondary issue, if it appears that the Plaintiff was indeed a willing participant, would be whether the assault might nevertheless have been willful and malicious because of its alleged unreasonable severity. Because the Court concludes that the Plaintiff did not willingly participate in the conflict with the Debtor, the secondary issue need not be addressed.

*Facts and Procedural History*

1. The Plaintiff's and Debtor's versions of the facts will be reviewed separately. The Plaintiff testified as follows:

a. On January 28, 1978, the Plaintiff, Adam H. Roesing, met his friend Dave Richards at a tavern some time after midnight and requested a ride home. Richards drove the Plaintiff to the Bottoms Up Tavern in Hazlet, New Jersey, where Richards hoped to meet someone from whom he could learn the location of a party. The bar was closed when they arrived but a number of cars were in the parking lot. Richards said to the Plaintiff, "Let's pull a gag;" he then went to a yellow Chevette belonging to Louis Bauch and began taking air out of the tires. The Plaintiff approached another automobile, a Grand Prix, but did not, he testified, let any air out of the tires.

Kenneth E. Joel, P.A., Keyport, N.J., for plaintiff.

Peter A. Berman, Matawan, N.J., for debtor-defendant.

b. The following persons then all arrived at the parking lot in the same car: the Debtor (Robert Moccio), Louis "Buddy" Bauch, Steve Citro, and a girlfriend of Citro's. Bauch approached both the Plaintiff and Richards, who were standing side by side, and asked "What are you letting the air out of my tires for?" He then started pushing the Plaintiff and Richards responded, "what are you picking on him for? I let the air out of your tire. . . ." Bauch and Richards then began a fist fight. The Plaintiff testified that he then moved 15 or 20 feet from them and leaned on another car because he considered the exchange between Bauch and Richards to be a "one-on-one fight." The Debtor then approached the Plaintiff, spoke some words which the Plaintiff could not remember and, while the Plaintiff was leaning against the car with his hands in his pockets, the Debtor hit him, rendering him briefly unconscious.

c. Thereafter, Plaintiff awoke feeling numb and dizzy, with his face covered with blood and his vision fuzzy. He walked to his brother's house nearby, where his brother cleaned him and put him to bed. The next morning his face was swollen and he could not open his eyes. He went to a hospital where he was a patient for 15 days under the care of an eye specialist, a neurologist and a surgeon.

2. The Debtor and Bauch testified that, far from being an innocent bystander, the Plaintiff was as much an aggressor as each of the other parties. The Debtor and Bauch agree that the Debtor arrived at the Bottoms Up parking lot in a separate car from Bauch, a short while after the arrival of Bauch. Bauch contends that when he saw the Plaintiff and Richards taking air out of his tires he asked "what are you doing to my car," to which Richards responded "Louie, I'll hit you with the f---ing wrench," referring to a vice grip Richards held in his hand. The three of them began fighting, and by the time the Debtor joined the fight, both Bauch and the Debtor contend, Bauch was holding the Plaintiff against a car, choking him with his hands around his neck, while Richards was on Bauch's back holding the wrench with which he had allegedly threatened to hit Bauch. Both testified that the Debtor then joined the fight, knocked the wrench out of Richards' hands, and Steve Citro threw it out of everyone's reach, but did not join the fight. The four fighters separated momentarily, and a fight then ensued with all four participating. When the Plaintiff tried to get between the Debtor and Richards, the Debtor hit the Plaintiff in the face, knocking him into a car, from which position he slumped to the ground on his knees. The Debtor admitted that he saw no one else hit the Plaintiff, although he felt that someone might have. At some point, the Plaintiff supposedly swung at the Debtor and the Debtor avoided the punch. As the fight proceeeced among the other participants, the Debtor and Bauch testified, they saw the Plaintiff run away across the highway. Thereafter, the fight ended and Bauch and the Debtor went inside with Richards and "cleaned him up."

3. Such was the testimony in this court on September 12, 1983. All parties had also given prior testimony regarding these events, however, in a criminal prosecution of both the Debtor and the Plaintiff in Hazlet Township Municipal Court on October 17, 1978, only nine months after the events took place. This testimony, which is admissible as admissions of a party under F.R.E. 801(d)(2) and as prior inconsistent statements of a witness under F.R.E. 801(d)(1)(A), is of great assistance in judging the credibility of the witnesses. In addition, certain inconsistencies developed within the Debtor's testimony in this court.

4. At the Municipal Court hearing, Bauch testified that he had no physical involvement with the Plaintiff prior to his fight with Richards, and that he could not remember what the Plaintiff was doing during his fight with Richards, which squarely contradicts his testimony in this court. Bauch's extremely brief testimony in the earlier hearing is open to reinterpretation, however, and he would admittedly have had an incentive at that time to avoid

implicating himself in an assault and battery.

5. The Debtor's testimony in the earlier hearing contained no hint that the Plaintiff had been physically involved in a fight before the Debtor's entry into the fight, and his description of the Debtor's participation is very mild, in spite of the fact that he would have had a strong incentive at that time to implicate the Plaintiff in an assault and battery. In addition, although he originally claimed in this court that the Plaintiff at one point tried to strike back at him, the Debtor appeared to recant this testimony. These inconsistencies are discussed at length in the Discussion section below.

6. At the time of this fight, Bauch and the Debtor worked together at a bar in the area, where Bauch was a bouncer and the Debtor was a bartender. They had also attended high school together, with the Plaintiff. They were good friends at that time and continued to see each other thereafter, but at the time of this proceeding had not seen each other for some time. Bauch testified that he had not discussed his testimony with the Debtor but conceded that the Debtor had notified him by telephone, about two weeks prior to the hearing, that his presence at court would be required, and conceded that the two had driven to the court in the same car the morning of the hearing. This helps to explain the consistency between the testimony of the Debtor and Bauch.

7. The Debtor was found guilty of simple assault and battery pursuant to N.J. S.A. sec. 2A:170–26 (West 1971)[1] as a result of the trial in the Hazlet Township Municipal Court on October 17, 1978. On appeal to the Monmouth County Court, the judgment was reversed for reasons not revealed by the record in this proceeding. The record does not reveal whether the Plaintiff was also convicted, although the Municipal Court Judge originally proposed at the hearing to find both the Plaintiff and the Debtor guilty of simple assault.

8. In a related civil proceeding, the Plaintiff sued the Debtor for damages for assault and battery and recovered a default judgment in the amount of $21,170.71 plus costs, after the Debtor had failed to respond to interrogatories. This award included compensatory damages of $11,-613.30 on the first count and $365.00 on the second count, punitive damages of $5,000 on the first count, and prejudgment interest of $4,192.41. The Plaintiff now seeks to have this judgment excepted from discharge.

9. The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on November 19, 1982.

10. The Plaintiff filed this complaint to determine the nondischargeability of his claim against the Debtor pursuant to section 523(a)(6) on January 31, 1983.

DISCUSSION

*Effect of the Default Judgment*

 The exclusive jurisdiction to determine the dischargeability of a debt is vested in the United States Bankruptcy Courts pursuant to section 523(c) of the Bankruptcy Code. For this reason, the Supreme Court held in *Brown v. Felsen*, 442 U.S. 127, 134, 99 S.Ct. 2205, 2211, 60 L.Ed.2d 767 (1979) a pre-petition determination of liability does not have res judicata effect in a nondischargeability action, because this would "undercut a statutory policy of resolving (sec.) 17 (and sec. 523) questions in bankruptcy court, and would force state courts to decide these questions at a stage when they are not directly in issue and neither party has a full incentive to litigate them." Under general principles of collateral estoppel, a prior adjudication precludes relitigation of an issue only if the following requirements are met:

"(T)he issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judg-

---

**1.** "Any person who commits an assault or an assault and battery is a disorderly person." N.J. S.A. sec. 2A:170–26 (West 1971); repealed by L.1978, c. 95, sec. 2C:98–2, eff. Sept. 1, 1979; replaced by N.J.S.A. sec. 2C:12–1 (West 1983).

ment; and (4) the determination must have been essential to the prior judgment." *Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir.1976). The same standard applies to collateral estoppel in a nondischargeability proceeding. *Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979); *In re Ross*, 602 F.2d 604, 608 (3d Cir.1979). Because none of the issues in this nondischargeability action were litigated in the civil proceeding, as it ended in a default judgment, that judgment has no binding effect in this case with respect to the Debtor's willfulness.

 If this Court should hold the Plaintiff's claim nondischargeable, however, the default judgment would have res judicata effect as to the amount of the Debtor's liability. *In re Comer*, 723 F.2d 737 (9th Cir.1984) (debtor barred from challenging amount of alimony fixed by default judgment). If the state court judgment had included unspecified damages for both dischargeable and nondischargeable claims, this Court would need to determine the proper division between the two, but because the Plaintiff's judgment was based solely on the alleged assault and battery, it must be held nondischargeable either in its entirety or not at all.

*Nondischargeability*

Section 523(a)(6) of the Bankruptcy Code provides:

"A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. sec. 523(a)(6).

"(A) wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 3 *Collier on Bankruptcy* sec. 523.16(1) at 523–119 (15th ed. 1983); *see also In re Trudeau*, 35 B.R. 185 (Bkrtcy.D.Mass.1983). A severe and unprovoked assault and battery is probably the clearest example of a willful and malicious injury excepted from discharge under section 523(a)(6). *See In re Ertz*, 10 B.C.D. 883, 28 B.R. 1020 (D.Ct.S.D.1983) (civil judgment denying punitive damages does not disprove maliciousness of assault and battery); *In re Pitner*, 6 B.C.D. 1133, 6 B.R. 731 (E.D.Tenn.1980) (civil judgment for assault and battery held conclusive on issue of maliciousness); 3 *Collier on Bankruptcy* sec. 523.16 at 523–123 (15th ed. 1983).

 The Debtor concedes that his attack upon the Plaintiff was intentional, and it is apparent that it produced serious harm to the Plaintiff, but the Debtor argues that the Plaintiff consented to the fight and willingly participated in it. The Debtor need not prove that he acted in self-defense. If the Plaintiff consented to or willingly participated in the fight with the Debtor, it would follow that the Debtor did not act willfully and maliciously, even though the Plaintiff sustained the worst of the injuries, unless the Debtor exceeded the Plaintiff's consent by the use of disproportionate violence. Traditionally, in tort, a plaintiff's consent did not bar him from recovery for assault and battery because, the fight being unlawful, the consent was construed as invalid. *Shay v. Thompson*, 59 Wis. 540, 18 N.W. 473 (1884); 6 Am. Jur.2d *Assault and Battery* sec. 157 at 156 (1963). The better rule is to deny recovery to a plaintiff who consented to the fight, as proposed by the *Restatement (Second) of Torts* sec. 892C(1) (1979), for reasons best stated in Prosser, *Law of Torts* sec. 18 at 107 (4th ed. 1971):

"But the cases have been roundly criticized on the grounds that no one should be rewarded with damages for his own voluntary participation in a wrong, particularly where, as is usually the case, he himself commits a crime; that the state is fully able to protect itself by a criminal prosecution; and that the parties, if they give any thought to the law at all, which is quite improbable, are quite as likely to be encouraged by the hope that if they get hurt they can still win in court. A

minority of some eight states, with the support of the Restatement, have held that the consent will defeat the civil action, except where the force used exceeds the consent."

For the same reasons, a judgment of nondischargeability should be denied when the plaintiff voluntarily participated in mutual combat with the debtor.

■ This proceeding is primarily a contest of credibility between the Plaintiff and the Debtor, and the testimony is therefore reviewed at length. The Plaintiff must prevail by a preponderance of the evidence, although, in the interest of accomplishing the "fresh start" policy of the Bankruptcy Code, such claims are restrictively viewed, in favor of the Debtor. *In re Ertz*, 6 B.C.D. 1265, 6 B.R. 637, 640 (Bkrtcy.D.S.D. 1980), *rev'd*, 10 B.C.D. 883, 28 B.R. 1020 (D.S.D.1983).

In evaluating the evidence, one must remember that all of these events were compressed into very few seconds, so that different versions may all be largely true in spite of apparent inconsistencies, because of the different perspectives from which the events were viewed. One person's memory of a brawl will never be perfect, and it is to be expected that inconsistencies will develop in testimony. Small inconsistencies, therefore, are not cause to believe that the witness is lying. If the Debtor had realized that his testimony in municipal court may have cost him over $20,000, he may have made a greater effort to present all the facts at that time. The Debtor and Bauch may have simply felt that elaborate testimony would not be necessary, and indeed, it was not: the Debtor's Municipal Court conviction was reversed by the Monmouth County Court. The inconsistencies between the two versions, however, are not simply a result of having gaps in the original version filled in by the later version. Certain of the inconsistencies are irreconcilable, and the significance of these contradictions persuades the Court that the later version was not the more accurate of the two, but was a convenient fabrication by the Debtor and his witness. Unfortunately, the Plaintiff's version of the facts also appears to be less than completely true.

*Plaintiff's Credibility*

The only clear inconsistency between the Plaintiff's testimony in 1978 and his testimony in this court in 1983 was in his claim that the idea to pretend to take air out of the car tires belonged exclusively to Richards; in the earlier hearing, he had accredited both Richards and himself with the idea.

The key credibility issue in the Plaintiff's testimony is raised by his claim that when Bauch and Richards began a fist fight, he simply moved away from the fight and leaned on a car with his hands in his pockets, and the Debtor hit him without provocation. This is somewhat unbelievable, but it finds partial support in two other facts. The Debtor and Bauch represented that Steve Citro, a companion of Bauch who had been present from the very beginning of the fight, chose not to become involved in the fight; it would presumably have been equally reasonable for the Plaintiff not to become involved. Also, when Bauch was asked what had occurred after the Debtor removed Richards from his back, he stated: "He just got him off my back. Then I went with Dave. Dave's a big boy." BT–71.[2] The implication is that Richards could take care of himself in a fist fight and that no intervention by the Plaintiff would have been necessary. It is also rather unbelievable that the Debtor would have assaulted the Plaintiff completely without provocation, but this cannot be dismissed out of hand in view of the fact that such assaults do occur. The credibility of this claim is best evaluated in view of the Debtor's testimony.

*Debtor's Credibility*

The gist of the Debtor's defense is that the Plaintiff was already involved in a fight with Bauch and Richards when the Debtor arrived; that the Debtor joined in the fight because Richards was threatening to hit Bauch with a wrench; and that after the

**2.** Transcript of Testimony in Bankruptcy Court, September 12, 1983.

wrench was thrown out of reach all four separated momentarily and thereafter the fight resumed with the willing participation of all four. This version finds little support in the testimony presented by the Debtor in the Municipal Court hearing.

In the Municipal Court criminal trial, the Debtor testified that when he arrived at the parking lot, Bauch and the Plaintiff were arguing; Richards then jumped in front of the Plaintiff, pulled out a wrench and threatened to hit Bauch. The Plaintiff then attempted to attack Bauch (although Richards was already attacking Bauch with a wrench), so the Debtor, in his own words, "grabbed Mr. Roesing (the Plaintiff), spun him around and struck him on the left side of the face." MT–17.[3] Neither the Debtor nor Bauch suggested that Bauch was choking the Plaintiff or that the two were other-

wise in physical contact, although admittedly they may have avoided such testimony to protect Bauch.[4] The Debtor's description of the Plaintiff's participation in the fight before the Debtor hit him was very mild: the Plaintiff "tried to get involved" and "tried to get in front of Mr. Richards to get at Mr. Bauch" he later added that the Plaintiff had been trying to "attack" Bauch. MT–16, 17, 19.[5] This is convincing evidence that the Plaintiff was at least not yet in a physical fight when the Debtor hit him. The vagueness and apparent hesitation with which the Debtor described the Plaintiff's alleged aggression is among the strongest reasons to conclude that the Plaintiff was not, in fact, an aggressor.

The Debtor's descriptions of his own battle with the Plaintiff also contain serious inconsistencies. On cross-examination, the

---

**3.** Transcript of Testimony in Hazlet Township Municipal Court, October 17, 1978.

**4.** "Q. Mr. Bauch, on January 28, 1978 were you involved in a fight, or a quarrel, or an argument in the parking lot of Bottoms Up with Mr. Richards.
A. Yes.
Q. Prior to that, did you have any physical involvement with Mr. Roesing?
A. Not really, no.
. . . .
Q. In connection with the altercation you had with Mr. Richards. Was Mr. Roesing in and around the area when that was going on?
A. Yes.
Q. What was he doing with relation with you? While that altercation was going on?
A. I can't remember. I was fighting with the other guy.
Q. It was a fight in a parking lot?
A. Yeah.
Q. That's all I have, Your Honor."
MT–21 (Direct examination of Bauch by Debtor's attorney).

**5.** "Q. Just tell us what you saw and what happened.
A. Alright. As I got. I got out of my car, I walked over to Mr. Bauch's car. Mr. Bauch and Mr. Roesing were arguing. And at which time, Mr. Richards jumped in front of Mr. Roesing and pulled out a pair of vice grips and said to Mr. Bauch, I'm going to hit you with these.
Q. And what happened between those two? What Happened?
A. Just started.
Q. How about Roesing? What did he do?
A. Tried to get involved.

MR. JOEL: I object to the characterization.
THE COURT: Alright.
Q. What did he do by trying to get involved. Did he go towards them or what?
A. Tried to get in front of Mr. Richards to get at Mr. Bauch.
Q. What did you do?
A. I grabbed Mr. Roesing, spun him around and struck him on the left side of his face.
Q. O.K. Was that the end of it?
A. Yes."
MT–16 to –17 (Direct examination of Debtor by Debtor's attorney).
"Q. And then your testimony is, that Mr. Roesing got in between the two of them?
A. He was trying.
Q. And tried to get to Mr. Bauch so he could hit him?
A. Mr. Roesing was trying to get in between Mr. Richard(s) because Mr. Bauch and Mr. Roesing were arguing at first.
Q. He tried to stop Mr. Richards hitting him with these vice grips?
A. No, he wasn't.
Q. Was he trying to attack Mr. Bauch?
A. Yes, he was.
Q. Even though Mr. Richards had this vice grip and said, I'm going to hit you with it?
A. Yes, he was.
Q. O.K. How many times did you hit Mr. Roesing?
A. I don't recall.
Q. Did he go? Was he knocked down when you hit him?
A. Yes, he was.
Q. Did any body else hit him after you did?
A. No."
MT–19 (Cross-examination of Debtor by Plaintiff's attorney).

Debtor testified at first that the Plaintiff did not fall down after the Debtor hit him, but tried to strike back at the Debtor unsuccessfully.[6] Later on cross-examination, however, he revised this testimony substantially: He admitted that his punch had knocked the Plaintiff against a car, and that seconds later the Plaintiff was kneeling on the ground against the car, but argued that because he had looked away "for a second" he could not be sure that it was his punch that had knocked the Plaintiff to the ground.[7] This revision is thoroughly inconsistent with his original claim that the Plaintiff had tried to hit him back after the Debtor hit him; it also contradicts his testimony in the Municipal Court, where he readily admitted that the Plaintiff was knocked down when he hit him and that no one else hit the Plaintiff after he did.[8] This is conclusive proof that no one

other than the Debtor is to blame for the harm done to the Plaintiff.

*Conclusion*

█ In spite of this lengthy review of the testimony, the precise details of the occurrence are not critical. The decisive issue is simply whether the Plaintiff entered the fight willingly. If so, the Debtor's actions could hardly be characterized as willful and malicious unless he acted with disproportionate violence. One must be careful not to conclude simply from the apparent lies of the Debtor that he is guilty of a willful and malicious injury; section 523(a) is not intended as a punishment for perjury. The Debtor testified at the Municipal Court hearing in 1978 that the Plaintiff had "tried to get involved" in the fight between Bauch and Richards, and tried to attack Bauch before the Debtor hit him. If true, and if the Debtor simply responded to the Plaintiff's actions in like manner, the

---

**6.** "Q. ... After you did that, when you hit Mr. Roesing, did he fall down, *did he go down from that blow?*

A. *No, he didn't.*

Q. He did not. You hit him on the right side of his face. Did he respond at all?

A. Yes, he did.

Q. Did he hit you back?

A. He didn't hit me in the face directly.

Q. Did he hit you back?

A. He tried to.

Q. Did he hit you back? Simple question.

A. I blocked it.

Q. *He tried to hit you back but you blocked it, that's your testimony?*

A. *That's my testimony.*"

BT–100 (Cross-examination of Debtor by Plaintiff's attorney).

See also BT–103 and BT–108.

**7.** "Q. All right. Now, this you ought to be more sure about. You testified today when you struck him, he didn't go down; is that right?

A. He didn't go down all the way to the ground, no.

Q. Okay, let's start this one over again. What do you mean by all the way to the ground?

. . . .

A. He went up against the side of the car.

Q. *So you knocked him against the side of the car?*

A. *Yes, I did.*

Q. *But he did not go any further down than that?*

A. *Not that I recall, no.*

Q. Well, did he or didn't he?

A. I didn't see him go down on the ground.

. . . .

A. I took my eyes off him for a second.

Q. Why did you take your eyes off him at that particular second?

A. Because I got hit myself.

Q. I see. *So you took your eyes off him for a second, and when you put your eyes back on him after a second where was he?*

A. *On the ground.*

Q. *On the ground. Where?*

A. *Kneeling right up against the side of the car.*

Q. Kneeling against the car? So would you say he was knocked down when you hit him?

A. I wouldn't say that.

Q. You would not say that. You would say you knocked him against the car, you took your eyes off him, when you looked at him again he was kneeling alongside the car?

A. I wasn't the only one near the car.

. . . .

Q. Did anybody else hit him after you did?

A. Not that I recall."

BT–111 to BT–114 (Cross examination of Debtor by Plaintiff's Attorney).

**8.** "Q. O.K. *How many times did you hit Mr. Roesing?*

A. *I don't recall.*

Q. *Did he go? Was he knocked down when you hit him?*

A. *Yes, he was.*

Q. *Did anybody else hit him after you did?*

A. *No.*"

MT–19 (Cross-examination of Debtor by Plaintiff's Attorney).

Debtor's actions could not be classified as willful and malicious. The question of credibility is rarely a simple one. Nevertheless, in view of the many inconsistencies which developed in the Debtor's most recent testimony, the Court concludes that the Plaintiff's allegations are much closer to the truth than the Debtor's, for the reasons discussed above. The judgment which the Plaintiff obtained against the Debtor on the basis of this willful and malicious assault and battery will therefore be excepted from discharge pursuant to 11 U.S.C. sec. 523(a)(6), in the sum of $21,-170.71 plus costs and legal interest thereon from the date of entry of the judgment. N.J.C.P.R. 4:42–11(b) (Gann 1984).

The Plaintiff should submit an order consistent with this opinion.