**In re Shirley Mae EGAN, individually and as officer and director of the Horse You Rode In On, Inc., Debtor.**

**Gloria KELLERHUIS, Plaintiff,**

**v.**

**Shirley Mae EGAN, individually and as officer and director of the Horse You Rode In On, Inc., Defendant.**

**In re Mario Angelo ROSSETTI, individually and as officer and director of the Horse You Rode In On, Inc., Debtor.**

**Gloria KELLERHÚIS, Plaintiff,**

**v.**

**Mario Angelo ROSSETTI, individually and as officer and director of the Horse You Rode In On, Inc., Defendant.**

**Bankruptcy Nos. 5–83–109, 5–83–150. Adv. Nos. 5–83–50, 5–83–57.**

United States Bankruptcy Court, D. Minnesota, Fifth Division.

June 7, 1985.

Steven L. Reyelts, Duluth, Minn., for plaintiff.

Joel T. Mitchell, Duluth, Minn., for defendant Egan.

Robert N. Roningen, Duluth, Minn., for defendant Rossetti.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The above-captioned matters came on for trial before the undersigned United States Bankruptcy Judge. Plaintiff appeared personally and by her attorney, Steven L. Reyelts. Defendant Shirley Mae Egan (hereinafter "Debtor Egan") appeared personally and by her attorney, Joel T. Mitchell. Defendant Mario Angelo Rossetti (hereinafter "Debtor Rossetti") appeared personally and by his attorney, Robert N. Roningen.

These are consolidated adversary proceedings for determination of dischargeability of debt under 11 U.S.C. 523(a)(6). For the reasons set forth in this opinion, the Court concludes that neither Debtor maliciously converted property of Plaintiff and, therefore, Debtors are entitled to judgment. Upon the evidence adduced at trial, the arguments and trial briefs of counsel, and all of the other files, records, and proceedings herein, the Court makes the following Findings of Fact, Conclusions of Law, and Order for Judgment.

## FINDINGS OF FACT

Debtor Egan filed her Petition for Relief under Chapter 7 of the Bankruptcy Code in this Court on April 25, 1983. Debtor Rossetti filed his Petition for Relief under Chapter 7 of the Bankruptcy Code in this Court on June 1, 1983. Prior to the filing of their Petitions, both Debtors were active as officers and directors of The Horse You Rode In On, Inc., a Minnesota business corporation which operated a retail store in Duluth, Minnesota.

Plaintiff is a resident of Duluth, Minnesota. From 1974 to 1980, she operated a retail store dealing in saddles, boots, and riding tack in Duluth under the name of "Kellerhuis Saddle Shop".

Both Debtors were horse fanciers and customers of Plaintiff. Debtor Egan had been employed at a variety of clerical and office positions in Duluth and Virginia, Minnesota. Debtor Rossetti had been employed as a staff artist and senior graphic designer by a local publisher of trade magazines. Prior to November, 1980, neither Debtor had had experience in the operation of small businesses or extensive experience with secured financial transactions. In November, 1980, Debtor Rossetti first approached Plaintiff at her store and asked her if she was willing to sell her business. After some negotiation, Plaintiff and Debtors agreed on a sale price.

Debtors retained attorney James Bodin of Duluth for preparation of the documents necessary to sell the business.[1] In February, 1981, Mr. Bodin drafted an Installment Sales Agreement, Promissory Note, Security Agreement, and a "UCC–1" financing statement.

On March 31, 1981, Plaintiff and Debtors met at Mr. Bodin's offices. All of the parties read the documents and Mr. Bodin paraphrased and explained each provision of the various documents. In pertinent part, the Installment Sales Agreement provides as follows:

THIRD: It is further agreed that the Buyers will keep said property in good repair and will not sell or remove said property or any part thereof from the City of Duluth, Minnesota, where it is now located, without the written consent of the Seller. Up to the day of payment of the purchase price in full, the Buyers ... will not remove or cause to be removed any stock-in-trade (inventory) from the business premises, except as it may be consumed in the regular course of trade; and will not assign any interest in this sales agreement or in the business, without the prior written consent of the Seller.

In pertinent part, the Security Agreement provides as follows:

C. Debtor will not sell or offer to sell or otherwise transfer or encumber the property except as hereinafter provided without the prior written consent of Secured Party, will keep the Collateral in good order and repair, and will not waste or destroy the Collateral ...

The Security Agreement granted Plaintiff a security interest in "Inventory, accounts receivable and fixtures of Kellerhuis Saddle Shop, 2027 West Superior Street, Duluth, Minnesota". Under the terms of the Installment Sales Agreement, Debtors agreed to purchase the business for the sum of $50,785.98, which was to be paid by Debtors' assumption of responsibility for $15,075.35 in accounts payable and by payments to Plaintiff of $500.00 per month toward reduction of the remaining balance of $35,710.63 and interest thereon. Plaintiff and Debtors properly executed all of these documents on March 31, 1981. (For a reason obscure to the Court, the parties backdated all of the documents to March 1, 1981.)

Mr. Bodin did not file the financing statement or the Security Agreement with the Secretary of State of Minnesota. He delivered the financing statement and the other

---

1. Though Plaintiff testified at trial that she was referred to Mr. Bodin by her accountant and that she retained him to represent her, other evidence leads the Court to conclude that she was in fact represented by counsel from another Duluth law firm during the negotiation of the terms of the written documents, and Mr. Bodin was representing Debtors during this process.

documents to Plaintiff on or about April 1, 1981. Upon her accountant's advice, Plaintiff recorded the Security Agreement in the office of the St. Louis County Recorder on June 10, 1982. The financing statement was not filed with the Secretary of State until Plaintiff did so "sometime in 1982 or 1983". The fact that the financing statement was not filed earlier was through no fault of either Debtor.

Debtors commenced operation of the business, retaining the name of "Kellerhuis Saddle Shop" for a period of several months. Concerned about personal liability for on-premises accidents, Debtors formed a Minnesota business corporation under the name of "The Horse You Rode In On, Inc.", in May, 1981. In consideration for the issuance of their shares of stock in the corporation, Debtors transferred all of the inventory, fixtures, and accounts receivable of the business to the corporation. Debtors did not notify Plaintiff of this transfer or of the incorporation.

After several months in business, Debtors experienced difficulty with obtaining trade credit due to the age of the accounts payable which they had assumed from Plaintiff. As a result, the store's inventory aged and business began to suffer. Debtors then applied for a loan from City National Bank of Cloquet, Minnesota, (hereinafter "City National") to get funds to pay the accounts payable. City National loaned Debtors approximately $15,000.00 and took second and third mortgages against Debtors' homestead to secure the loan.

Several months after the City National loan, business still had not improved to a point where the shop was generating a profit. Debtors then decided to expand operations, opening an additional store at another location and significantly upgrading the size and quality of the store's inventory. In October, 1981, Debtor Rossetti approached a loan officer at Western National Bank of Duluth, Minnesota (hereinafter "Western National") to apply for another business loan. Debtor Rossetti conducted most of the application and negotiation process with loan officer Emily Wilson

of Western National. During the application process, Debtors revealed the existence of Plaintiff's prior security interest in the existing inventory to Ms. Wilson and gave her copies of the Installment Sales Agreement and Security Agreement for her inspection. Ms. Wilson had a "UCC search" performed of the records of the office of the Secretary of State of Minnesota. This search revealed that, as of November 17, 1981, no financing statements on the store inventory had been filed in that office. Ms. Wilson advised the Debtors of the lack of prior filings but did not explain the significance of this fact. Neither Debtor understood that Plaintiff's rights under the Security Agreement might be jeopardized by the failure to file the financing statement; both Debtors felt that Plaintiff was still "fully secured".

As security for any loan made, Ms. Wilson requested that Debtors' corporation grant Western National a security interest in the existing inventory (the value of which was then estimated by Debtors and Western National at approximately $60,000.00) and that Debtors grant a second mortgage in their homestead.

Western National duly approved Debtors' application for credit. On November 30, 1981, Debtors executed a Loan Agreement, Security Agreement, and Financing Statement as officers of their corporation, granting Western National a security interest in "all inventory of Debtor now owned or hereafter acquired to include, however, not limited to the inventory of Western Clothing, Boots, Hats, Accessories, and Tack ...". Debtors also guaranteed the loan as individuals and granted Western National a second mortgage in their homestead to secure their guarantee.

Western National had a title examination performed on Debtors' homestead after the date of this loan. It revealed the existence of the City National mortgages. Ms. Wilson requested that Debtors renegotiate the Western National loan to obtain an additional advance to pay off the City National mortgages. As a result, Debtors negotiated a second loan with Western National on

December 23, 1982, in the principal amount of $43,485.94. This loan was secured by the same inventory and second homestead mortgage as the earlier Western National loan, which was paid with the proceeds of the second loan. The Financing Statement evidencing Western National's security interest in the store inventory was duly perfected by filing in the office of the Secretary of State of Minnesota.

Debtors did not notify Plaintiff that they had granted a security interest in the store inventory to Western National on either occasion.

Debtors opened their new store with the proceeds of the Western National loans. However, during 1982 their personal relationship soured. Their personal disputes and confrontations disrupted the business to the point where client goodwill and stable operations suffered. Upon learning of this, Emily Wilson deemed Western National's security to be in jeopardy. She convinced both Debtors to execute an agreement with Western National on October 20, 1982, under the terms of which they agreed to deliver all inventory and stock-in-trade to Western National and to allow Western National to conduct a liquidation sale. Under the terms of the agreement, the proceeds of sale were to be applied to the outstanding balance of the loan with Western National; Debtors were to continue to be liable on their individual guarantees if the loan were not satisfied by the proceeds of sale. Both Debtors executed this agreement without consulting an attorney. As of the date of the agreement, the corporation held inventory of a wholesale value of about $67,000.00. Debtors believed in good faith that the proceeds of the liquidation sale would be nearly sufficient to pay both Plaintiff and Western National in full and that any anticipated deficiency would be small enough that they would be able to satisfy it out of their personal funds. Debtor Rossetti would not have allowed the sale or signed a consent to the sale if he

had believed that the proceeds would not be sufficient to pay Plaintiff in full.

Pursuant to the agreement, a liquidation sale was conducted. Western National applied the full proceeds of this sale to Debtors' obligation to it. The proceeds were not sufficient to pay that obligation in full; a $7,000.00 deficiency remained. No proceeds of this sale were paid to Plaintiff.

Debtors never advised Plaintiff of the liquidation agreement or the liquidation sale. Plaintiff did not become aware of the liquidation until after Western National had closed the store. After the store closing, a liquidator retained by Western National sold the fixtures and remaining unsold inventory at auction and forwarded the net proceeds, in the amount of $976.00, to Plaintiff. Plaintiff has received no other payment from Debtors or any other party on Debtors' obligation to her under the Installment Sales Agreement.

## CONCLUSIONS OF LAW

Plaintiff's cause of action in this adversary proceeding is premised upon 11 U.S.C. § 523(a)(6), which provides in pertinent part as follows:

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> . . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

Congress' apparent intent in enacting this exception to discharge was to prevent the abuse of bankruptcy remedies by debtors who had, by intentional and malicious actions, made themselves liable to other persons or entities.[2]

 Though the statute does not expressly so state, "willful and malicious injury" can encompass a willful and malicious conversion. S.REP. no. 989, 95th Cong., 2d

---

2. It is clear that, given the congressional goal of affording a "fresh start" to honest debtors in financial distress, Congress intended to allow discharge of liability for injuries occasioned solely by a debtor's negligence. *Tinker v. Colwell*, 193 U.S. 473, 489, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904).

Sess. 79 (1978), U.S.Code Cong. & Admin. News 1978, 5787; 3 COLLIER ON BANKR. ¶ 523.16 at 523–130 (15th ed. 1984); *In Re Pommerer,* 10 B.R. 935, 940 (Bankr.D.Minn.1981). A finding of conversion requires a finding that the debtor wrongfully assumed dominion over personal property to the exclusion of possession and control by the owner, and in repudiation of the owner's rights. *In Re Pommerer at* 940. As in other proceedings under 11 U.S.C. § 523(a) where a complaining creditor has the initial burden of going forward, the plaintiff must prove the existence of all of the elements under § 523(a)(6) by clear and convincing evidence, a standard of proof more stringent than the usual burden in civil cases of a preponderance of the evidence. *In Re De-Rosa,* 20 B.R. 307, 311 (Bankr.S.D.N.Y. 1982); *In Re Irvin,* 31 B.R. 251 (Bankr.D. Colo.1983). *See also In Re Huff,* 1 B.R. 354 (Bankr.D.Utah 1979).

To prevail under § 523(a)(6), a plaintiff must show that the debtor inflicted injury both willfully and maliciously. *In Re Thomas,* 36 B.R. 851, 853–4 (Bankr.W.D. Ky.1984), and cases cited therein. To determine whether both elements have been proven the Court must determine the state of mind of the allegedly wrongdoing debtor. Determination of subjective state of mind has always been problematic for the Courts. It therefore comes as no surprise

that the Courts have had difficulty in enunciating a single clear standard for the showing of state of mind which must be made by the plaintiff in proceedings under § 523(a)(6) and its predecessors.

■ The legislative history settles the question as to the first element, that of "willfulness". It plainly establishes that "willful" means "deliberate or intentional". H.R.REP. No. 595, 95th Cong., 1st Sess. 363 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, 5787. This element requires that a plaintiff show that a debtor intentionally, and not negligently or "accidentally", performed the basic action of which the plaintiff complains. See *In Re Hodges* 4 B.R. 513, 517 (Bankr.W.D.Va. 1980). Thus, any act which is consciously, deliberately, or intentionally performed by the debtor is performed "willfully". A negligent act is not. The Courts have nearly uniformly followed this distinction since the enactment of the Bankruptcy Code. *See, e.g., In Re Vereen,* 43 B.R. 489, 491 (Bankr.M.D.Fla.1984).

■ The Courts have had much greater difficulty in determining what a plaintiff need show to establish that a debtor acted "maliciously". *See,* in general, the discussion in *United Bank of Southgate v. Nelson,* 35 B.R. 766, 9 C.B.C.2d 745 (N.D.Ill. 1983).[3] On the facts of this case, this

---

**3.** The confusion is probably due at least in part to the sheer variety of fact situations presented in the cases; the harms complained of range from assault and battery [*In Re Moccio,* 41 B.R. 268 (Bankr.D.N.J.1984) ] all the way through violations of Federal statutes establishing farm-worker labor standards [*In Re Vereen* ] and protecting trademarks [*In Re Klayminc,* 37 B.R. 728 (Bankr.S.D.Fla.1984) ]. This would probably confound any effort to dispose of the issues under any single rubric.

Also, much of the confusion has resulted from the House and Senate Committee reports, which are not phrased as precisely as may be desired:

Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* 193 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a looser standard is intended and to the extent that other cases

have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

H.R.REP. No. 595, 95th Cong., 1st Sess. 365 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 79 (1978), U.S.Code Cong. & Admin.News 1978, 5865, 6320. The cases applying this legislative history to determine the meaning of "malicious" have generally fallen into two distinct lines. The first line is the progeny of *In Re Hodges, supra.* In *Hodges* the Court held that the legislative overruling of the *Tinker* standard extended to *both* of the elements of state of mind under § 523(a)(6). Thus, the *Hodges* Court held that a plaintiff could not satisfy its burden on the malice element by showing only that the debtor acted in "reckless disregard" of the plaintiff's rights, or that the debtor's malice was implied by the very nature of the act complained of, without some specific expression of malice by the debtor. Rather, the plaintiff had to show that the debtor had a specific intent to harm the

Court declines to enunciate a standard for the state of mind requisite to a finding of nondischargeability for all proceedings under § 523(a)(6). More narrowly, the facts of this case do not even require the Court to elect between the two currently-recognized approaches to the malice element.[4] A debtor's sale or other disposition of secured property, however tortious, is not an act which invariably implies malice toward the secured party; nor is it an act which is always without just cause or excuse. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934);

*In Re Hinckle,* 9 B.R. 283 (Bankr.D.Md. 1981). Thus, regardless of which interpretation it applied, the Court would have to weigh the evidence to determine malice and cannot rely upon the mere fact of sale to infer it.

██ The Court does decline to require a plaintiff to prove up actual personal hatred, illwill or spite on the part of the debtors. This would impose a nearly insurmountable burden. *In Re Lewis* at 86; *In Re Pereira,* 44 B.R. 248, 257 (Bankr.D. Mass.1984). For proceedings alleging con-

---

plaintiff. *In Re Hodges* at 516. *See also, In Re Finnie,* 10 B.R. 262 (Bankr.D.Mass.1981); *In Re Cecchini,* 37 B.R. 671, 10 C.B.C.2d 744 (Bankr. 9th Cir.1984).

The Courts in the second line of cases have concluded that the legislative overruling of the *Tinker* standard applies only to the element of "willfulness". These Courts have held that the Collier formulation of the test for malice—"a *wrongful act* done intentionally, *which necessarily produces harm and is without just cause or excuse*"—still has vitality. 3 COLLIER ON BANKR. ¶ 523.16 at 523–129 (15th ed. 1984) [emphasis added]; *In Re Meyer,* 7 B.R. 932 (Bankr.N.D.Ill.1981); *In Re Auvenshine,* 9 B.R. 772 (Bankr.W.D.Mich.1981); *In Re Klix,* 23 B.R. 187 (Bankr.E.D.Mich.1982); *In Re Lewis,* 31 B.R. 83 (Bankr.W.D.Okla.1983); *In Re Irvin,* 31 B.R. 251 (Bankr.D.Colo.1983); *United Bank of Southgate v. Nelson; In Re Sindic,* 44 B.R. 167 (Bankr.E.D.Wis.1984). Under these cases, proof of some outward manifestation of specific intent to do harm to the plaintiff is not necessary; rather, the Court may to some degree infer malice from the very nature of the act.

Much of the confusion over the extent to which the *Tinker* standard was legislatively overruled has resulted from the misperception that "reckless disregard" is relevant to the issue of willfulness. *Tinker* itself establishes that disregard of another's rights, reckless or knowing, actually goes to the issue of malice:

> ... the injury was willful, because it was voluntary. The act was unlawful, wrongful and tortious, and, being willfully done, it was, in law, malicious. It was malicious because the injurious consequences which followed the wrongful act were those which might naturally be expected to result from it, and which the defendant Freche must be presumed to have had in mind when he committed the offence. *'Malice',* in law, simply means a depraved inclination on the part of a person to disregard the rights of others, which intent is manifested by his injurious acts.

193 U.S. at 486–87, 24 S.Ct. at 509, quoting *In Re Freche,* 109 F. 620 (D.N.J.1901). [emphasis add-

ed]. Thus, at least to the extent it and its progeny equated "reckless disregard" with malice, *Tinker's* holding on the malice element was overruled. As indicated in n. 4 *infra,* this Court suspects that the perfunctory inferring of malice sanctioned by the *Tinker* Court is no longer appropriate either.

4. Were the question squarely presented to this Court, it would not be inclined to impose the strict *Hodges* requirement of a showing of actual, conscious intent to harm. However, neither would it be included to allow a creditor to rest merely on proof of an *action* which, by judicial conclusion, was *malum in se,* without some proof of a culpable state of mind in the debtor. The drawback to the latter approach is apparent to a modern-day reader of *Tinker v. Colwell.* The conduct which the Supreme Court considered to be so invidious that it compelled a finding of nondischargeability is no longer an actionable tort in many states. *See, e.g.,* MINN. STAT. § 553.01 *et seq.* (This development is most likely due to the great change in attitudes toward the social role of women and the role of the state in protecting and fostering the institution of marriage from those obtaining when the Supreme Court ruled in *Tinker.*) The focus of the Court's inquiry under the malice requirement of § 523(a)(6) should be on the harmful consequences and actual damage to the plaintiff, and the debtor's actual knowledge or the reasonable foreseeability of the harm—not on abstract and perhaps moralistic notions of the "wrongfulness" of the debtor's act. To the extent that this conclusion is inherent in the *Tinker* standard of implied or constructive malice this Court would be included to adopt that standard. *See In Re McCloud,* 7 B.R. 819, 824–26 (Bankr.M.D.Tenn.1980); *In Re Klix,* 23 B.R. 187, 190 (Bankr.E.D.Mich.1982). To the extent that the *Tinker* standard requires presumption of malice arising from the nature of a tortious act regardless of the debtor's knowledge or awareness, this Court would not be so inclined. *Contra, In Re Nicoll,* 42 B.R. 87, 90 (Bankr.N.D.Ill. 1984).

version of secured collateral, the Court adopts the reasoning and test formulated by former Judge Patrick J. McNulty of this Court. Under this standard, malice is shown by proof that a debtor disposed of security with the specific knowledge that the disposition would invariably and indubitably cause harm to the secured creditor, *or* by proof that the debtor had the specific intention of causing harm to the secured creditor by the disposition. This is a factual determination which can be made only on a case-by-case basis. *In Re Christianson,* ADV 5–80–19, slip op. at 4–5 (Bankr.D. Minn. May 13, 1981); *In Re Pommerer* at 940. A malicious conversion under § 523(a)(6) necessarily "transcends a minimal or technical wrongdoing and evinces a willingness to voluntarily inflict injury". *In Re Pommerer* at 940. Where collateral security is involved, actual intent or willingness to harm may be proven by a showing of deliberate failure to inform the creditor prior to the sale, or deliberate concealment of the sale afterwards. *In Re Duranti,* 1 B.R. 54 (Bankr.W.D.Wis.1979); *In Re McCloud,* 7 B.R. 819, 3 C.B.C.2d 701 (Bankr.M.D.Tenn.1980). In any event, a showing that the debtor knew the plaintiff had specific rights to its security and the proceeds thereof and deliberately disregarded those rights is sufficient. *In Re Pommerer* at 941; *In Re Davis,* 11 B.R. 156, 4 C.B.C.2d 377 (Bankr.D.Vt.1980).

In the instant case, there is no dispute that Plaintiff had a property interest of considerable value in the form of her security interest in the inventory. Plaintiff argues that Debtors converted this property on four different occasions: first, when Debtors executed a bill of sale transferring all of the assets of Kellerhuis Saddle Shop to The Horse You Rode In On, Inc.; second and third, when they pledged all of the corporate assets to Western National on the two occasions in November and December, 1981; and fourth, when they signed the agreement with Western National allowing it to liquidate the store inventory. The Court concludes that though the first three events may have constituted technical conversions of Plaintiff's property, she

was harmed in no way by them. Because Debtors' corporation took the inventory with actual notice of Plaintiff's security interest, the security interest survived the transfer. Because Western National took its security interest in the inventory with actual notice of Plaintiff's rights, the creation of Western National's security interest did not destroy Plaintiff's security interest and may not even have subordinated it. *See* MINN.STAT. § 336.9–301 and 307. *Cf. In Re Krause,* 44 B.R. 159 (Bankr.N.D. Ill.1984) (concluding granting of security interest in store fixtures and equipment to bank was willful and malicious conversion, where seller retained title thereto under installment sales agreement).

■ However, Plaintiff was manifestly damaged by the liquidation of the store inventory at Debtors' behest; she received none of the proceeds of the liquidation sale and less than $1,000.00 from the auction of the goods not previously disposed of in the liquidation sale. Debtors' consent to the liquidation was a tortious conversion of Plaintiff's property; the liquidation sale was not a consumption of the inventory in the regular course of trade, which was the only disposition authorized by Plaintiff under the Installment Sales Agreement. Debtors' consent to the sale was unquestionably a wrongful assumption of dominion over the inventory in repudiation of Plaintiff's interest in it.

Upon a thorough review of all of the evidence, with particular attention to the demeanor and conduct of witnesses, the Court concludes that Plaintiff has failed to show that Debtors acted maliciously in converting her property. There is no question that Debtors' consent to the liquidation was a willful act, in the sense that Debtors executed the consent intentionally and deliberately; their affirmative act cannot be characterized as negligent. However, Plaintiff has failed to prove by clear and convincing evidence that Debtors' consent to the liquidation sale was malicious. Debtors acted on the belief that the proceeds of sale would be sufficient to almost completely satisfy both Plaintiff's and

Western National's interests in the inventory. They made this assumption on the basis of the wholesale value of the inventory, apparently concluding that the party conducting the liquidation sale would price and sell items at no less than wholesale value. In retrospect, Debtors' assumptions were misinformed and naive; obviously, Western National was concerned only with concluding the liquidation and recovering its interest in the inventory as quickly as possible. However, there is no evidence of record that Debtors consented to the liquidation knowing that it would certainly result in Plaintiff's total loss of her interest in the inventory. Debtors' testimony is entirely to the contrary. Plaintiff's case in chief and lengthy cross-examination of both Debtors failed to elicit any proof that Debtors ever harbored actual, specific intent to cause harm to Plaintiff. Unlike the debtors in *In Re Pommerer*, Debtors never sought to garner the exclusive benefit from the disposition of Plaintiff's collateral and to leave Plaintiff as the sole party at risk from the disposition. In conclusion, while Plaintiff has proved that Debtors willfully inflicted injury upon her, she has failed to prove that they acted maliciously in doing so.

Because Plaintiff has failed to prove all of the elements of § 523(a)(6) by clear and convincing evidence, it logically follows that the Court cannot find that Debtors' debt to Plaintiff are non-dischargeable in bankruptcy.

### ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Debtor Egan's debt to Plaintiff was not excepted from the discharge in bankruptcy granted to Debtor Egan on August 10, 1983, and that Debtor Rossetti's debt to Plaintiff shall be discharged upon entry of discharge in his case.

LET JUDGMENT BE ENTERED ACCORDINGLY.